COURT OF APPEALS OF VIRGINIA

Present:  Judges Benton, Willis and Bray
Argued at Norfolk, Virginia

SHAWN PAUL NOVAK

v.          Record No. 1416-92-1          OPINION BY
                                          JUDGE RICHARD S. BRAY
COMMONWEALTH OF VIRGINIA                   MAY 23, 1995

          FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                        John K. Moore, Judge

          Richard G. Brydges; Stephen C. Mahan (Brydges, Brydges
          and Mahan, on briefs), for appellant.

          Richard B. Smith, Assistant Attorney General (James S.
          Gilmore, III, Attorney General, on brief), for appellee.

          Amicus Curiae: Youth Advocacy Clinic and Mental
          Disabilities Clinic, University of Richmond Law School
          (Robert E. Shepherd, Jr.; Kathe Klare; Robin Hegner, on
          brief), for appellant.


     Shawn Paul Novak (defendant), a juvenile, age sixteen, was

convicted by a jury on an indictment charging capital murder.  On

appeal, defendant complains that he was improperly transferred from

the Juvenile and Domestic Relations District Court (J&D court) to

the trial court for prosecution as an adult, and that the trial

court failed to conduct a de novo review of such transfer.

Defendant further contends that the trial court erroneously (1)

declined to suppress his confession and certain psychiatric

evidence, (2) refused to order the Commonwealth to "open" its

"files" to his inspection, (3) overruled his motion for additional

pretrial psychiatric evaluation, (4) permitted cameras in the

courtroom, (5) denied a continuance to permit his investigation of

exculpatory evidence first disclosed during trial, and (6)

overruled his motion for a mistrial.  Defendant also challenges the

sufficiency of the evidence to support the conviction.  Finding no error, we affirm the judgment of the trial court.

Under familiar principles of appellate review, we examine the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. Traverso v. Commonwealth, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988).

On the evening of March 4, 1991, Christopher Weaver, age seven, and Daniel Geier, age nine, did not return to their respective homes from play.  Earlier that day, both children had briefly visited with a neighbor, Benet Stead, and were last seen by him at "about quarter after five to 5:30," in the company of defendant, at the edge of nearby "woods."  The following morning, a "search party" combed this wooded area, and the children's bodies were discovered by James McKinsey hidden beneath "stacks of pine tree limbs."  According to the medical examiner, Weaver died from "three stab wounds which would have been a quick three thrusts resulting in incapacitation and . . . repeated cutting and slashing of the neck until it was almost decapitated . . . ."  Geier had been killed by a "blunt force injury" and "multiple slashes" on his neck.

Although McKinsey did not recall seeing defendant during the search, shortly after the discovery defendant claimed to a friend, Donald Williams, that he had personally located the bodies.  The following day, March 6, 1991, defendant related a similar story to schoolmates and others.  Later that same day, defendant commented

to Williams's mother that he had seen the children at approximately 5:00 p.m. on the afternoon of their disappearance.  She immediately telephoned a police "hotline" in defendant's presence, and he then spoke to a "gentleman on the phone," willingly providing his name and address.

During the ensuing investigation, defendant, accompanied by his mother, was interviewed by detectives at police headquarters on three separate occasions.  At the final meeting between Detective Hoffman and defendant, Hoffman told defendant that a police officer had observed conduct by defendant at the crime scene inconsistent with his earlier statements, and that police had obtained defendant's fingerprints from the clothing of a victim, all of which was untrue.  Nevertheless, Hoffman testified that he did not regard defendant as a "suspect until . . . [he] asked, 'Did you kill them?'" and defendant answered, "yes."  This response prompted Hoffman to immediately advise defendant of his Miranda rights, followed by defendant's execution of a related waiver and detailed confession to the crimes.

During a subsequent search of defendant's residence, police discovered a knife, a book entitled "Serial Killers," and several newspaper clippings of articles related to other violent crimes in the region, all from defendant's bedroom.  Experts testified that the knife, or "another object having exactly the same features," had impressed a blood stain on the trousers of one victim and was the "tool" used to cut tree limbs that had covered the bodies.

Prosecution of defendant was commenced in the Virginia Beach

J&D court.  However, following an <u>ore</u> <u>tenus</u> hearing pursuant to Code § 16.1-269,[1] jurisdiction was transferred to the trial court for treatment of defendant as an adult.  In ordering transfer, the J&D court expressly "found probable cause to believe that [defendant] had committed" the offenses and noted that all "the statutory requirements for transfer had been met."  <u>See</u> Code § 16.1-269(A), (C).  Due to the "gravity of the charges," the J&D court did not consider defendant "amenable to treatment or rehabilitation as a juvenile."  <u>See</u> Code § 16.1-269(A)(3)(b).

Defendant appealed the transfer decision to the trial court, challenging the failure of the J&D court to properly consider his "amenability . . . to treatment within the juvenile court."  He argued that the trial court, while it need not review probable cause, must "make its own determination" of the several statutory factors requisite to transfer.  <u>See</u> Code § 16.1-269.  However, "after having examined all such papers, reports and orders pertaining hereto" and "carefully listen[ing] to arguments of counsel," the trial court concluded that the J&D court had "complied with [Code §] 16.1-269," and permitted the Commonwealth to "seek an indictment against the defendant."

Incidental to the proceedings both in the J&D court and trial courts, defendant was the subject of several psychiatric examinations.  Dr. Robert Showalter testified in behalf of defendant that he exhibited a "schizotypal personality disorder."

---

[1]All citations to Code § 16.1-269 in this opinion refer to the statute as amended in 1990.

- 4 -

Drs. Lee Mingione and Paul Mansheim, Commonwealth witnesses, disagreed and opined that defendant knew right from wrong when he murdered the victims.  Dr. Mingione further noted that defendant was "very bright," "interactive," and "evinced no unusual personality traits for a sixteen-year-old."

## I. Transfer Hearing

Defendant first contends that his transfer from the J&D court to the circuit court for trial as an adult was unconstitutional because the attendant proceedings lacked the "individualized and particularized" consideration mandated by the Eighth Amendment in death penalty cases.  See Stanford v. Kentucky, 492 U.S. 361, 375-76 (1989).  However, because defendant was not sentenced to death, we find this argument moot.  See Lewis v. Commonwealth, 218 Va. 31, 38, 235 S.E.2d 320, 325 (1977) (When "life term was substituted . . . for a . . . sentence of death, the conclusion is inescapable that the question of the constitutionality of [the procedures leading to] the death penalty has been rendered moot."); see also Bumper v. North Carolina, 391 U.S. 543, 545 (1968) (complaint that jury was unconstitutionally "death qualified" rendered moot when defendant received life sentence).

Defendant further argues that the Virginia juvenile transfer statute unconstitutionally permits a juvenile, age fifteen or older and charged with armed robbery, rape, or murder, to be "certified" to the circuit court for trial as an adult without a preliminary

finding that the accused is unamenable to treatment as a juvenile.[2] Defendant contends that such "automatic certification" denies both equal protection and due process. We disagree.

In Hutcherson v. Commonwealth, 7 Va. App. 534, 536-37, 375 S.E.2d 403, 404 (1989), this Court approved a "finding of nonamenability based solely on the nature of the offense," provided the related inquiry included consideration of "circumstances surrounding the offense," the "extent of the juvenile's involvement[,] and the interests of society and of the child." We also expressly recognized that a "determination of nonamenability based solely on the face of the charge is . . . permissible when the offense is one of those enumerated in the statute [i.e., armed robbery, rape, and murder]." Id. at 537, 375 S.E.2d at 404 (emphasis added). Contrary to defendant's argument, this provision does not result in "automatic certification." The statute simply dispenses with the finding that the juvenile is unamenable "to treatment or rehabilitation" as a prerequisite to transfer in such instances. Code § 16.1-269(A)(3)(b). The remaining "conditions" of Code § 16.1-269(A) must be satisfied before "[a]ny such transfer" is ordered. Code § 16.1-269(A).

---

[2]Code § 16.1-269(A)(3)(b) reads in pertinent part:

> [W]hen the alleged delinquent act is armed robbery, rape as provided in § 18.2-61 or murder, or when the child has previously been tried as an adult and convicted of a felony and is presently alleged to have committed an act which would be a felony if committed by an adult, the court may certify the child without making the [amenability to treatment] finding required by this subdivision.

The legislature had a rational basis for treating a juvenile charged with murder, rape, or armed robbery differently from one prosecuted for a less violent offense.  Hutcherson, 7 Va. App. at 537, 375 S.E.2d at 404; see Ballard v. Commonwealth, 228 Va. 213, 217, 321 S.E.2d 284, 286 (1984), cert. denied, 470 U.S. 1085 (1985).  Code § 16.1-269(A)(3)(b) identifies certain violent crimes against the person as acts inconsistent with the conduct of an offender amenable to treatment as a juvenile, a distinction both logical and constitutional.  The resulting "classification" is, therefore, reasonably related to a "legitimate" governmental objective, New Orleans v. Dukes, 427 U.S. 297, 303 (1976), juvenile rehabilitation consonant with protection of the public. Hutcherson, 7 Va. App. at 536-37, 375 S.E.2d at 404; see Code § 16.1-227.  "[C]ourts will not overturn a statutory classification on equal protection grounds unless it is so unrelated to the achievement of a legitimate purpose that it appears irrational." Ballard, 228 Va. at 217, 321 S.E.2d at 286; see Commonwealth v. Ramey, 19 Va. App. 300, 302, 450 S.E.2d 775, 776 (1994).

## II. Appeal of Defendant's Transfer

Defendant appealed the J&D transfer decision to the trial court pursuant to Code § 16.1-269(E).  In subsequent correspondence to counsel, the trial judge noted that, although defendant was entitled to a "hearing" on the transfer issue, a "de novo review was not appropriate."  Despite defendant's contention that the court erred, Russell v. Commonwealth, 16 Va. App. 660, 432 S.E.2d

- 7 -

12 (1993), instructs that <u>de</u> <u>novo</u> review by the circuit court is unnecessary, provided "[t]here [is] . . . a hearing that gives <u>meaningful review</u>."  <u>Id.</u> at 665, 432 S.E.2d at 16 (emphasis added).  The record discloses that the trial court examined "all of the papers connected with this case," including the transcript, transfer report, and the J&D transfer order, and "carefully listen[ed] to the arguments of counsel," before ruling that the "requirements of [Code §] 16.1-269 were . . . complied with . . . ."  Such consideration clearly constituted the "meaningful review" of the transfer decision contemplated by Code § 16.1-269 and <u>Russell</u>.

Defendant asserts for the first time on appeal that the trial judge improperly placed the burden upon him to prove noncompliance with Code § 16.1-269.  It is well established that this Court will not consider an argument on appeal which was not presented to the trial court.  <u>Jacques v. Commonwealth</u>, 12 Va. App. 591, 593, 405 S.E.2d 630, 631 (1991); Rule 5A:18.  We, therefore, decline to address this issue.


### III. Admissibility of Confession

Defendant contends that the trial court erroneously overruled a motion to suppress his confession, portions of which preceded <u>Miranda</u> warnings.  <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  However,

> [t]he Supreme Court has made it clear that the prescribed
> warnings must be given before statements are taken from
> suspects only where there is custodial interrogation as thus
> defined in <u>Miranda</u>:  "By custodial interrogation, we mean

- 8 -

questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

Coleman v. Commonwealth, 226 Va. 31, 46, 307 S.E.2d 864, 872 (1983), cert. denied, 465 U.S. 1109 (1984) (quoting Miranda, 384 U.S. at 444 (footnote omitted)); see Wass v. Commonwealth, 5 Va. App. 27, 30, 359 S.E.2d 836, 837 (1987).  "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'"  Stansbury v. California, ___ U.S. ___, ___, 114 S. Ct. 1526, 1528-29 (1994) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)) (citation omitted); see Burket v. Commonwealth, 248 Va. 596, 604, 450 S.E.2d 124, 129 (1994); Commonwealth v. Milner, 13 Va. App. 556, 558, 413 S.E.2d 352, 353 (1992).

In this analysis, "the situation must be viewed from the vantage point of 'how a reasonable man in the suspect's position would have understood his situation.'"[3]  Wass, 5 Va. App. at 32, 359 S.E.2d at 839 (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  On review, we must consider the evidence in the light

_____

[3]Circumstances relevant to this determination include defendant's age, intelligence, background and experience with the criminal justice system, police conduct, surroundings, physical restraint, length and character of the interrogation, and the focus of police suspicion.  See Harrison v. Commonwealth, 3 Va. App. 260, 265, 349 S.E.2d 167, 169-70 (1986); Wass, 5 Va. App. at 32-33, 359 S.E.2d at 839; Kauffman v. Commonwealth, 8 Va. App. 400, 404-05, 382 S.E.2d 279, 281 (1989).

most favorable to the prevailing party below, the Commonwealth in this instance, id. at 30, 359 S.E.2d at 837, and the trial court's findings will not be disturbed unless unsupported by the record. See Lanier v. Commonwealth, 10 Va. App. 541, 555, 394 S.E.2d 495, 504 (1990).

Here, defendant, accompanied by his mother, had twice voluntarily come to police headquarters for interviews. During a third visit, under like circumstances, defendant confessed to the offenses. He had been previously advised that he was neither under arrest nor a suspect, and Detective Hoffman only wanted to ascertain "anything . . . or anyone that [defendant] may have seen in the area."

The interview was conducted in a carpeted room, "approximately ten-by-twelve," furnished with a table and several chairs. A "one-way mirror" permitted visual access from an adjoining room. Although defendant's mother was present at the inception of the interview, Hoffman persuaded her to leave the room, insisting that defendant could then more comfortably discuss "his friend's whereabouts" and "habits." Defendant was aware, however, that she remained nearby, still in the building. Until the confession, defendant was permitted to move about the building and "was . . . free to leave at anytime."

This evidence, considered with the entire record, including a video tape of the interview in issue, provided abundant support for the trial court's determination that defendant was not "in custody" at the time of his initial admission of guilt and prior Miranda

warnings were, thus, unnecessary.

However, defendant reminds us that any confession, "even if obtained in full compliance with Miranda, may be inadmissible if . . . not voluntary." Kauffmann, 8 Va. App. at 405, 382 S.E.2d at 281. It is well established that the "Commonwealth bears the burden of proving by a preponderance of the evidence" that the accused knowingly, intelligently, and voluntarily waived his Miranda rights. Mills v. Commonwealth, 14 Va. App. 459, 468, 418 S.E.2d 718, 722-23 (1992); Wilson v. Commonwealth, 13 Va. App. 549, 554, 413 S.E.2d 655, 658 (1992).

In assessing the voluntariness of a confession on appeal, "[w]e must [independently] determine whether, in light of the totality of the circumstances, including not only the details of the interrogation, but also the characteristics of the accused, the statement was the product of an essentially free and unconstrained choice by its maker, or whether the maker's will was overcome and his capacity for self-determination critically impaired." Goodwin v. Commonwealth, 3 Va. App. 249, 253, 349 S.E.2d 161, 163-64 (1986); Gray v. Commonwealth, 233 Va. 313, 324, 356 S.E.2d 157, 163, cert. denied, 484 U.S. 873 (1987); Mills, 14 Va. App. at 468, 418 S.E.2d at 723. In our review of this issue, we again consider "the evidence in the light most favorable to the prevailing party" below, the Commonwealth in this instance, Mills, 14 Va. App. at 468, 418 S.E.2d at 723, and "are bound by the trial court's subsidiary factual findings unless those findings are plainly wrong." Wilson v. Commonwealth, 13 Va. App. 549, 551, 413 S.E.2d

- 11 -

655, 656 (1992).

Here, the trial judge found defendant "highly intelligent" and "articulate in his answers to the questions." He noted from the video tape of the interview that defendant was "smoking cigarettes," taking refreshment, "smiling," and "obviously in complete control of himself," "with a full understanding of the interview process and what was being said and why he was there." From this evidence and the other circumstances attending the interview, the court concluded that defendant "made a knowing and intelligent waiver of [Miranda] rights," "signed the written waiver form," and "acknowledged that he wished to make a statement." This finding is well supported by the record.

Although defendant argues that his mother's presence in the interview room was an indispensable ingredient to voluntariness, "it is well established that the mere absence of a parent . . . does not render a [juvenile's] waiver invalid." Grogg v. Commonwealth, 6 Va. App. 598, 613, 371 S.E.2d 549, 557 (1988).

Defendant's contention that Hoffman's use of deception tainted the confession is also without merit. See Hutto v. Ross, 429 U.S. 28, 30 (1976). While "[a] deliberate falsehood by a police officer in the course of his duties may undermine the respect that significant segments of the public may have for law enforcement and the system of justice[,]" Wilson v. Commonwealth, 13 Va. App. at 554, 413 S.E.2d at 658, "'a lie on the part of an interrogating police officer does not, in and of itself, require a finding that a resulting confession was involuntary.'" Id. at 555, 413 S.E.2d at

658 (quoting Rodgers v. Commonwealth, 227 Va. 605, 616, 318 S.E.2d 298, 304 (1984)).  Nothing in this record suggests that deception by Hoffman compelled defendant's waiver or confession, against his will and without choice.

Thus, our independent review of the record discloses that defendant's waiver and related confession were voluntary and properly admitted into evidence by the trial court.

### IV. Suppression of Dr. Mansheim's Report and Testimony

In response to the Commonwealth's representation that "the appointment of a psychiatrist [was] necessary for preparation of [its] case in meeting the defendant's insanity plea," the trial court appointed Dr. Paul Mansheim "to assist the Commonwealth and determine (1) the defendant's mental state or condition at the time of the alleged offense, and (2) the defendant's capacity to appreciate the criminality of his conduct at the time of the offense."  Thereafter, Mansheim conducted an examination of defendant in accordance with the order and prepared an attendant report.

During a subsequent hearing, it was disclosed that the Commonwealth was deliberately withholding this report pending receipt of a report from defendant's psychiatrist, Dr. Showalter, then months overdue.  Defendant thereafter requested the court to compel production of the Mansheim report pursuant to Code § 19.2-168.1.  Defendant also asserted that the "conduct of . . . the Commonwealth and . . . Mansheim, acting in concert," raised

- 13 -

"serious doubt upon the neutrality of . . . Mansheim" and requested the court to suppress the related evidence and "open" the Commonwealth's "case files" to defendant's inspection. The trial court ordered that the Mansheim report be made available to defendant and Showalter's report be prepared and shared with the Commonwealth, but otherwise overruled defendant's motion.

"The remedial relief to be granted by the trial court following a discovery violation or upon the late disclosure of evidence is within the trial court's discretion and will not be disturbed on appeal unless plainly wrong." Moreno v. Commonwealth, 10 Va. App. 408, 420, 392 S.E.2d 836, 844 (1990); see also Frye v. Commonwealth, 231 Va. 370, 383, 345 S.E.2d 267, 277 (1986) ("The relief to be granted upon a violation of Rule 3A:11 is within the discretion of the trial court . . . ."). "Late disclosure does not take on constitutional proportions unless an accused is prejudiced by the discovery violations depriving him of a fair trial." Moreno, 10 Va. App. at 417, 392 S.E.2d at 842; see Davis v. Commonwealth, 230 Va. 201, 204-05, 335 S.E.2d 375, 377-78 (1985). Here, defendant received the Mansheim report a full two weeks before trial, and there is no evidence of prejudice resulting from the delayed disclosure. Accordingly, we find no error in the ruling of the trial court.

### V. Request for Additional Psychiatric Evaluation

On February 19, 1992, defendant requested transport to Rockingham Memorial Hospital in Harrisonburg for eight days to

permit additional "one on one" examinations by Showalter. The court denied the motion, noting that trial was scheduled for March 2, 1992, and that Showalter, "involved since [the preceding] June," should conduct the interview locally to insure defendant's availability for any necessary pretrial "proceedings." While defendant challenges this ruling, he offers nothing to establish any attendant prejudice. The issue was clearly a matter resting within the sound discretion of the trial court, and we cannot say that the court abused such discretion in this instance. See Cardwell v. Commonwealth, 248 Va. 501, 508-09, 450 S.E.2d 146, 151 (1994).

We need not address defendant's related, but unsupported, assertion that, by denying access to a psychiatrist, the trial court "effectively denied [defendant] due process, equal protection, the right to call evidence on his behalf[,] and the effective assistance of counsel." "Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration." Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992).

## VI. Cameras in the Courtroom

Several days prior to trial, the court informed counsel that a request for media coverage of the trial had been granted, and that a camera would be located in the "back of the courtroom."[4]

---

[4]At the time of defendant's trial, the Circuit Court for the City of Virginia Beach was among several trial courts participating in an experimental program which permitted such coverage of

Defendant conceded that "the ultimate decision on that is up to the court" but "oppose[d] the . . . coverage," arguing that "certification as an adult [did not] necessarily remove[] it from the juvenile realm."  The court recognized that Code § 19.2-266 prohibited cameras in "juvenile proceedings," but concluded that a juvenile transferred for trial as an adult was not embraced by the exclusion and permitted the coverage.  Defendant complains that this ruling denied him protection of the statute, due process, and equal protection.

Code § 16.1-269(F) provides that "[a]fter the case has been transferred or removed and the grand jury returns a true bill upon such indictment the jurisdiction of the juvenile court as to such case shall terminate."  Id.  Thus, once a juvenile is transferred to the circuit court pursuant to Code § 16.1-269, he is thereafter prosecuted as an adult.  In such circumstances, a decision to permit cameras in the courtroom rests with the sound discretion of the trial court, Code § 19.2-266, and "[a]bsent a showing of prejudice of constitutional dimensions," Chandler v. Florida, 449 U.S. 560, 582 (1981), the mere presence of cameras does not result in an unfair trial.  See Savino v. Commonwealth, 239 Va. 534, 547 n.4, 391 S.E.2d 276, 283 (1990); Fisher v. Commonwealth, 236 Va. 403, 410 n.2, 374 S.E.2d 46, 50 (1988).  Defendant failed to demonstrate "good cause" to exclude the cameras and offered no authority for his constitutional arguments.  See Code § 19.2-266.

judicial proceedings pursuant to former Code § 19.2-266.

- 16 -

We, therefore, conclude that the trial court properly allowed cameras in the courtroom during the proceedings.

## VII. Motion for Continuance

On the morning of the third day of jury selection, March 4, 1992, the Commonwealth disclosed to the court and defendant "arguably exculpatory" information, first learned after trial had commenced, and defendant immediately requested a continuance "to investigate."[5] However, finding that it was "clear . . . that [the evidence in issue] . . . constitute[d] hearsay . . . and would be inadmissible in the trial," the court denied this motion. The court also noted that the "information" was already "in the mind of the defendant," and he "would be the source" of it.

"The decision whether to grant a continuance is a matter within the sound discretion of the trial court. Abuse of discretion and prejudice to the complaining party are essential to reversal." Venable v. Venable, 2 Va. App. 178, 181, 342 S.E.2d 646, 648 (1986); see also Lowery v. Commonwealth, 9 Va. App. 304, 307, 387 S.E.2d 508, 509 (1990). Under the circumstances here, we cannot say that the trial court abused its discretion in denying the motion.

## VIII. Motion for Mistrial

_____

[5]A "memorandum" of this "information" was apparently prepared by the Commonwealth and provided to defendant, but it could not be located in the record. See Turner v. Commonwealth, 2 Va. App. 96, 99, 341 S.E.2d 400, 402 (1986).

During recross-examination of Detective Hoffman, the Commonwealth objected to certain inquiries pertaining to defendant's statements to Hoffman. In the presence of the jury, the prosecutor argued that

[w]hat [defendant] may have said -- [defendant] is a witness available to the defense. He's not available to the prosecution. That's why the rules of evidence are the way they are. The issue is whether or not -- this witness can testify certainly to what his own statements were, but not to what the defendant may have told him. That would be hearsay. That's what my objection is.

Following further examination of Hoffman both by counsel for both defendant and the Commonwealth, defendant moved for a mistrial based upon the earlier comment and was overruled.

In determining whether a remark falls within the boundary of the prohibition that a prosecutor shall not make an adverse comment before the jury on a defendant's failure to testify, the test is whether, in the circumstances of the particular case, "the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."

Williams v. Commonwealth, 4 Va. App. 53, 80, 354 S.E.2d 79, 94 (1987) (quoting Hines v. Commonwealth, 217 Va. 905, 907, 234 S.E.2d 262, 263 (1977)). "In order to prevail on appeal, [defendant] must show that he was substantially prejudiced by the improper comments of the Commonwealth's attorney." Jackson v. Commonwealth, 12 Va. App. 798, 799, 406 S.E.2d 415, 416 (1991); see also Martinez v. Commonwealth, 10 Va. App. 664, 669, 395 S.E.2d 467, 470 (1990), aff'd as modified, 241 Va. 557, 403 S.E.2d 358 (1991). New trials will be granted only "where the prosecuting attorney has so clearly departed from the line of legitimate procedure that any reasonable

person will conclude that the jury were certainly prejudiced thereby." Winston v. Commonwealth, 12 Va. App. 363, 369, 404 S.E.2d 239, 242 (1991) (emphasis added).

Upon a review of the "totality of the evidence," we are not persuaded that the comments in issue were so clearly prejudicial. See Fain v. Commonwealth, 7 Va. App. 626, 629-30, 376 S.E.2d 539, 541 (1989). The remarks were directed to the trial judge, not the jury, and nothing in the record suggests a reckless or deliberate procedural impropriety by the Commonwealth. Any related impressions gathered by the jury from the comments would be purely conjectural. Accordingly, we find that the trial court acted within its discretion and properly denied a mistrial. See Cheng v. Commonwealth, 240 Va. 26, 40, 393 S.E.2d 599, 607 (1990).

## IX. Motion to Strike/Motion to Set Aside

At the conclusion of both the Commonwealth's evidence and of all evidence, defendant moved to strike on the grounds that the Commonwealth had not proven premeditation and deliberation, elements necessary to the offenses. These motions, and a similar motion and attendant argument to set aside the verdict, were denied by the trial court.

In assessing the sufficiency of the evidence, we must view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). The credibility of a witness, the weight accorded the testimony,

and the inferences to be drawn from proven facts are matters solely for the fact finder's determination. Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989). The jury's verdict will not be disturbed unless plainly wrong or without evidence to support it. Id.

In Epperly v. Commonwealth, 224 Va. 214, 294 S.E.2d 882 (1982), the Supreme Court recognized that the premeditation and deliberation necessary to "elevate a homicide to first degree murder" were issues within the "province of the jury." Id. at 232, 294 S.E.2d at 892. Considerations appropriate to this determination include "the brutality of the attack, . . . whether more than one blow was struck, the disparity in size and strength between the defendant and the victim, the concealment of the victim's body, and the defendant's lack of remorse and efforts to avoid detection." Id. Here, defendant admitted brutal and unprovoked attacks on two small children with a deadly weapon followed by efforts to conceal the bodies. This confession, together with the other evidence, provided abundant support to the finding that defendant acted with the requisite premeditation and deliberation.

For the reasons set forth above, we affirm the decision of the trial court.

                                              Affirmed.

BENTON, J., dissenting.


On Monday, March 4, two boys, age nine and age seven, were reported missing in the City of Virginia Beach.  Novak, a high school student who six weeks earlier had turned sixteen, participated in the search for the two boys.  The police inquiry into the murder of the boys led them to question a number of people, including Novak.  Novak had spoken to someone on the police "hot line" the day after the bodies of the murdered boys were discovered and said that he had seen them walk into the wooded area where their bodies were found.

On March 6, Novak's mother received a telephone call at work from Detective Hoover.  He asked for permission to talk to her children.  Novak's mother initially replied, "no," but consented after the detective pressed her for consent.  After agreeing to the detective's request, she called home and learned that the detective was already in her home when he called.  When she learned that the detective was questioning Novak in the detective's vehicle, she made arrangements to leave work.

That same afternoon, Giselle Ruff, a police evidence technician, took photographs of Novak's bedroom.  Later that evening Detective Hoover returned and requested permission to talk to Novak in his car.  Novak's mother refused.  At the detective's request, she agreed to take Novak to the police station.  She stated, however, that when they arrived at the police station she was not invited into the room where Novak was interviewed for two

hours.

Novak was upset when the police ended the questioning.  The police told Novak's mother on Wednesday night that they wanted to talk to him again.  She told them that she did not want them to talk to Novak unless she was present.

Novak was again questioned at his home on Thursday afternoon, March 7, by Detective Tucker and perhaps others.  When Detective Tucker called Novak's mother at work and asked for permission to talk to Novak, she became upset because they were again in her house talking to Novak.  She told Tucker he could not talk to Novak.

Later that day, the detective called Novak's mother again and asked her to bring Novak back to the police station.  On Thursday evening she brought Novak to the police station.  Detective Hoffman questioned him for two hours.  Again, Novak's mother was not invited in the interview room.  During questioning, the detective discovered inconsistencies between Novak's statements and information obtained from other witnesses.  Novak's mother was asked to bring Novak to the police department the next day for further questioning.

Novak's mother testified that she was particularly concerned and very protective of Novak in connection with police questioning.  Novak had no previous contact with police or court history.  She was also concerned because Novak's father, who was away on duty in the United States Navy, could not be reached.  She had complained to the police about their previous interviews with Novak out of her

presence and felt that she was being manipulated by the police department.

Novak and his mother arrived at the police station at 9:00 a.m. Saturday, March 9. When Detective Hoffman began the interview, he advised Novak and his mother that Novak was not a suspect and was not under arrest. The detective told her that he only wanted to clarify some things and determine whether Novak had seen something and not realized its significance. Novak's mother decided to remain in the interrogation room. Unknown to Novak and his mother, the entire session was videotaped.

Novak was not advised of his right to an attorney or to remain silent. After about thirty minutes of questioning, Detective Hoffman asked Novak's mother to leave the interrogation room. She reluctantly did so after Detective Hoffman assured her that Novak was not a suspect and that he wanted to talk with Novak about "sensitive areas not dealing with these kids." She left the interrogation room and remained in the lobby of the police headquarters.

After Novak's mother left, Detective Hoffman changed his position in the interrogation room so that he was seated facing Novak. Detective Hoffman recommenced the interview as other detectives viewed the interrogation through a one-way mirror and videotaped the questioning. The interrogation was stopped on several occasions, when Novak went to the bathroom, had a soft drink, ate a donut, and spoke once with his mother.

Detective Hoffman told Novak that he could rely on him and

that he was not suspected of anything.  However, Detective Hoffman began to lie to Novak as the interview progressed.  He lied about police observations on the day of the search; he lied about the presence of a witness who saw Novak walking with the two victims; he lied about new laser technology which enabled them to secure fingerprints; and he lied about Novak's fingerprints being found on the boys' clothing.

Detective Hoffman testified that he would not have told Novak any lies if Novak had not been a suspect.  He testified that Novak became a suspect and the primary focus of the investigation during the course of the interrogation.  He further testified, however, that he was "suspicious" of Novak when he began the interview.

Shortly before noon, Detective Hoffman assured Novak that he was not a suspect.  He continued to interrogate Novak in a barely audible tone using lies and information gathered from other witnesses.  Hoffman then confronted Novak with contradictions in his statements and the evidence gathered from other witnesses.  The detective got Novak to admit being with the boys and then asked the following:

> Q    Shawn, I know you cut the branches.  I know that you cut them and covered them.  Isn't that true?
>
> A    Yeah.  They had been on the ground.  Were on the ground.  I walk by.  Monday.
>
> Q    Shawn.  You can talk to me.  Don't be afraid.  Get it out.  Don't be afraid. Something happened and you went too far?  Is this something that just happened?
>
> A    Yeah.

Q    You killed them, didn't you?

A    (No audible response.  Shawn nods his head in the affirmative.)

Q    You killed Scott and Daniel?

A    Yes.

Q    Okay.  Shawn, do you want to talk about it?  Huh?

[There was a knock at the door.]

DET. HOFFMAN:  I'll be back in a minute.

[Whereupon a recess was taken.  Shawn is left in the room alone and is crying.  After the recess Det. Hoffman returns to the room and the interview continues as follows:]

BY DET. HOFFMAN:

Q    Shawn, are you okay?

A    Yeah.

Q    I need to read something to you.

    You have the right to remain silent. Anything you say can and will be used against you in court.  You have a right to talk to a lawyer and have him present with you while you are being questioned.  If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning, if you wish.  You can decide at any time to exercise these rights and not answer any questions or make any statements.

    Do you understand these things that I just told you?

A    (Shawn nods head.)

Q    Check here.

A    (Shawn complies.)

    Having these rights in mind, would you like to talk to me?

A   (The witness nods head.)

Q   Check here.

A   (Shawn complies.)

Q   Sign your name for me right here.

A   (Shawn complies.)

Q   Do you want me to tell her or do you want me to wait?

A   Let her know.

The detective continued to question Novak without interruption.  Two hours after she was asked to leave the room, Novak's mother was informed by an officer of Novak's admissions.  She demanded that the interrogation be stopped and that she be allowed to consult with a lawyer.

I.

Statements made by an accused during custodial interrogation and without proper Miranda warnings are inadmissible as evidence.  Dean v. Commonwealth, 209 Va. 666, 667-68, 166 S.E.2d 228, 230 (1969).  The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Miranda v. Arizona, 384 U.S. 436, 444 (1966) (footnote omitted).  In making the determination whether a person has been deprived of freedom of action, the situation must be viewed from the perspective of "how a reasonable [person] in the suspect's position would have understood his situation."  Berkemer v. McCarty, 468 U.S. 420, 442 (1984) (footnote omitted).  Merely

- 26 -

"informing a suspect that he is not in custody and is free to leave does not necessarily mean that he is not in custody."  Wass v. Commonwealth, 5 Va. App. 27, 34, 359 S.E.2d 836, 840 (1987).  The circumstances that must be considered in determining whether an interrogation is custodial include "whether a suspect is questioned in familiar or neutral surroundings, the number of police officers present, the degree of physical restraint, . . . the duration and character of the interrogation, [w]hether or when probable cause to arrest exists[,] . . . when the suspect becomes the focus of the investigation[,] '[t]he language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual.'"  Id. at 32-33, 359 S.E.2d at 839 (citations omitted).

The evidence proved that when Novak was interrogated on Saturday morning the circumstances effectively rendered the interrogation custodial.  By virtue of his youthful age and lack of experience with the police, Novak had no basis upon which to conclude that he had not been deprived of his freedom of action. Novak was interrogated at the police station.  The interrogation occurred in a small, closed room.  He had been interrogated at the same place on two prior occasions.  At each of those interrogations, the police separated him from his mother.  On this third occasion his mother requested that she be permitted to remain in the room during the questioning.  Half an hour later, however,

with Novak present in the room, Detective Hoffman asked Novak's mother to leave. Hoffman admitted deceiving Novak's mother in order to get Novak alone in the interrogation room. When Novak's mother left, Detective Hoffman moved his chair closer to Novak, placing himself between Novak and the door in the small room. He also lied to Novak at least four times during the course of the interrogation.

Although Detective Hoffman testified that Novak did not become a suspect until contradictory facts were elicited during the course of the Saturday interrogation, the objective facts belie that assertion. Hoffman also testified that he was "suspicious" of Novak prior to the Saturday interrogation. Moreover, several photographs of Novak's bedroom were taken four days prior to this interrogation. In addition, the detailed questioning of Novak's conduct, movements, and statements during interrogations which lasted several hours each over the course of four days manifestly establish that Novak was a suspect in the police's investigation prior to this last interrogation. This last session was just the culmination of an investigation that focused upon Novak as a suspect.

The interrogation was accusatory, it was suggestive, repetitive, and deceptive. It was the last in a series of five interrogations that took place over a four day period. All of these circumstances surrounding this investigation as well as the events of the interrogation itself prove that the interrogation was custodial. Any reasonable person in Novak's position would have so

understood.  The detective used the opportunity to exclude Novak's mother and to bear down upon the sixteen year old in the confines of an interrogation room at the police station.  Novak was questioned in the coercive setting of the police station in the absence of any <u>Miranda</u> warnings.

In determining that Novak was not in custody when he confessed, the majority posits that Novak voluntarily came to the police station with his mother that morning.  Even if this interrogation was not custodial at its inception, the evidence proved that the atmosphere of the interrogation changed when Novak's mother was deceived into leaving the room.  Detective Hoffman positioned himself closer to Novak, used ruses to trick him, and extracted his confession by accusing Novak of killing the boys.  Under these circumstances, a reasonable sixteen year old would have believed that he was required to answer the police officer's questions and was not free to leave until he did so.

## II.

"The burden is upon the Commonwealth to prove, by a preponderance of the evidence, that [Novak's] statement was voluntary."  <u>Williams v. Commonwealth</u>, 234 Va. 168, 172, 360 S.E.2d 361, 364 (1987), <u>cert.</u> <u>denied</u>, 484 U.S. 1020 (1988).  "The test to be applied in determining voluntariness is whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or . . . whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.'"  <u>Stockton v. Commonwealth</u>, 227 Va. 124, 140, 314 S.E.2d 371, 381,

cert. denied, 464 U.S. 873 (1984) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).  Thus, an inquiry must be made into the circumstances of the interrogation, including "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequence of waiving those rights." Fare v. Michael C., 442 U.S. 707, 725 (1979).

An analysis of these factors coupled with the tactics used to extract the confession from Novak mandates the conclusion that Novak's confession was involuntary and not a product of his own free will.  The absence of a parent is "a circumstance that weigh[s] against the admissibility of the confession."  Miller v. Maryland, 577 F.2d 1158, 1159 (4th Cir. 1978).  That circumstance must be given significant weight in view of Detective Hoffman's deliberate decision to deprive Novak of the opportunity to have a parent present who could provide assistance in asserting his constitutional rights.

The detective knew that Novak's mother had affirmatively stated that she wanted to be present.  Novak's mother testified that on two occasions prior to the day of Novak's confession, police officers had called her at work asking if they could question Novak.  She was adamant that any questioning be done in her presence.  When she accompanied Novak to the police station on Saturday morning, she asked to be in the interrogation room.  After being told that Novak was not a suspect and that Detective Hoffman

understood her concerns, she was asked to leave the room. Detective Hoffman admitted misleading Novak's mother so that she would leave Novak alone in the interrogation room. The detective's trickery is a compounding factor to be considered in the totality of the circumstances analysis. See Spano v. New York, 360 U.S. 315, 327 (1959).

The detective lied to Novak's mother when he stated that he needed to talk to Novak about a sensitive matter unrelated to the dead children. As soon as she left the room, the detective began to question Novak about his involvement in the murders. The detective's deceptive conduct heightened the coercive atmosphere in which Novak made the confession and evidences the conclusion that the officer was attempting to overcome Novak's free will. See Commonwealth v. MacNeill, 502 N.E.2d 938, 942 (Mass. 1987) ("[D]eliberate police avoidance of a parent's participation in an exchange between the police and a juvenile . . . would be highly suspect.").

The opportunity for a juvenile to have a parent present to afford protection for the free exercise of the juvenile's constitutional rights cannot be overemphasized. The Supreme Court has noted that "admissions and confessions of juveniles require special caution." In re Gault, 387 U.S. 1, 45 (1967). Indeed, the Court has recognized that with juveniles "we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the

benefits of his constitutional rights."  Gallegos v. Colorado, 370

U.S. 49, 54 (1962).  Several states believe that the presence of a

parent or other adult representative is so important that they have

a per se rule that requires that a juvenile be given Miranda

warnings and the opportunity to consult with an adult who

understands these rights before an admission may be obtained from a

juvenile.  See Commonwealth v. A Juvenile (No. 1), 449 N.E.2d 654

(Mass. 1983).

In addition to misleading Novak's mother, Detective Hoffman

admitted lying to Novak during the interrogation.  His lies and

trickery are factors that weigh heavily against a finding of

voluntariness.  Spano, 360 U.S. at 327; Rodgers v. Commonwealth,

227 Va. 605, 614, 318 S.E.2d 298, 303 (1984).  The detective's

lies, coupled with leading and "suggestive questioning," Morris v.

Commonwealth, 17 Va. App. 575, 580, 439 S.E.2d 867, 871 (1994),

constitute conduct designed to provoke Novak's confession.

Detective Hoffman's tactics cannot be viewed only in light of

the nature of the questioning.  His exploitative tactics were

practiced on a barely sixteen year old youth who had never before

been involved in any criminal activity.  A juvenile's lack of

"[p]revious exposure to the criminal justice system" also is a

factor that weighs against a finding of voluntariness.  Green v.

Commonwealth, 223 Va. 706, 710, 292 S.E.2d 605, 608 (1982).

The record clearly established that during the interrogation

Novak's responses accorded with Officer Hoffman's suggestive

questioning.  Novak, who, according to the prosecutor's

psychiatrist, exhibited signs of "immaturity" and "a need for being recognized and appreciated" was no match for Hoffman's skill in extracting confessions.  Under the best of circumstances, a sixteen year old "boy, no matter how sophisticated is unlikely to have any conception of what will confront him when he is made accessible only to the police."  Gallegos, 370 U.S. at 54.

Another factor to be considered is the failure to give any Miranda warnings until after Novak made his admissions.  "Proof that some kind of warnings were given or that none were given [is] relevant evidence . . . of whether the questioning was in fact coercive."  Beckwith v. U.S., 425 U.S. 341, 348 (1976).  The detective testified that he considered Novak "suspicious" before the interrogation, and that, as the interrogation proceeded, Novak became a suspect.  It was not until Novak confessed and Hoffman was interrupted by another officer who had been observing the questioning, however, that Miranda warnings were read to Novak. Furthermore, the videotape of the session established that the warning was given in barely audible tones while Novak was clearly upset.  The officer then addressed Novak's level of understanding only in a perfunctory fashion and obtained his written waiver, by causing him to make a check mark without explanation.  The interrogation then proceeded without interruption.

Because all of these factors unequivocally establish that Novak was deprived of his freedom of action and that Novak's confession was involuntary, I would hold that the Commonwealth failed to prove that the confession was voluntary and admissible.

Accordingly, I would reverse his conviction.  I dissent.