COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Fitzpatrick, Judge Annunziata and
         Senior Judge Overton
Argued by teleconference


COMMONWEALTH OF VIRGINIA
         MEMORANDUM          OPINION[*]                BY
    Record No. 3062-01-2    JUDGE ROSEMARIE ANNUNZIATA
                                  MAY 17, 2002
QUINCY BROWN, S/K/A
 QUINCY JAMIL BROWN


         FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    Thomas N. Nance, Judge

         Amy L. Marshall, Assistant Attorney General
         (Jerry W. Kilgore, Attorney General, on
         brief), for appellant.

         Prescott L. Prince (Carrie W. Witter, Third
         Year Law Student; Clarke & Prince, on brief),
         for appellee.


     Quincy Brown (defendant) stands indicted for murder,

attempted murder, carjacking, and robbery. The Commonwealth

appeals a pretrial ruling granting defendant's motion to suppress

a statement he made during a custodial interrogation. It

contends the statement should not be suppressed because Brown

knowingly, intelligently, and voluntarily waived his right to

counsel and his right to remain silent. For the reasons that

follow, we affirm the trial court's decision.


                            Background

     Viewed in the light most favorable to Brown, the party

─────────────
     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

prevailing below, Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991), the evidence proved that on July 13, 2001 at 4:00 p.m., two uniformed police officers approached Brown, fifteen years old at the time, because they suspected he had participated in several crimes they were investigating. They found him smoking a marijuana cigarette. The officers informed Brown that he had been seen in the victim's automobile.

Detective James E. Foster, who was investigating the crimes, arrived at the scene soon thereafter. One of the officers searched Brown and found in his back pants pocket a gold ring belonging to one of the victims. The officer then arrested Brown. After Brown was informed of his Miranda rights, Detective Foster took him to the police station for questioning.

The police did not attempt to contact Brown's mother to advise her that he had been arrested and was in police custody. The police knew he was fifteen years old with only an eighth grade education. They did not know he had an intellectual functioning capacity of an eight year old.

In the interrogation room, Detective Foster, after some preliminary questions, told Brown:

> I'm going to read you your rights before I start talking to you.
>
>    \*     \*     \*     \*     \*     \*     \*
>
> What I'd like for you to do is listen to me while I read you these rights. Don't make any comment to me, don't get mad, don't get abrupt, just listen and then, I'll tell you and then you can tell your side of the story.
>
> [Reading from the form] You have an absolute right to remain silent and make no statement

- 2 -

to me.  Any statement you make [inaudible] an attorney may be used as evidence against you.  You have the right to the presence of an attorney at this or any future interview the police may have with you.  If you are unable to hire an attorney, the court will appoint one for you.  You understand those rights?  [Brown nods.]

And understanding these rights, if you wish to waive them and make a statement to me you can if you wish.[1]

What I want you to do is sign your name here [handing him the form] that I read you your rights and that you understand them.

Complying with the detective's directive, Brown signed the form without reading it.  Detective Foster did not give Brown an opportunity to read the form, nor did he further explain that by signing it, Brown was giving up his constitutional rights.  He did not specifically ascertain whether Brown understood that he was waiving his right by signing the form.  He did not ask Brown if he could read, or if he had difficulty in school.  Indeed, Foster testified that he did not know if Brown understood the meaning of the term "waiver."

After Brown signed the form, Foster told Brown the facts known to the police.  He informed him that the police had found a ring belonging to one of the victims in Brown's back pocket, which would pose a problem for him because it "put [him] at the scene."  Foster promised Brown he would ask the prosecutor for leniency toward Brown if he "[told him] the whole truth."

Although Brown had six prior criminal charges against him in

_____

[1] The form, however, states: "I understand these rights and wish to waive them and make a statement."

the juvenile system, the record does not indicate whether he had ever before been in an interrogation room or had been advised of his Miranda rights.

Based on the totality of the circumstances as evidenced by the videotape, which the trial court viewed, and the other evidence before it, the trial court granted Brown's motion to suppress his statement, reasoning as follows:

> [Y]ou have got a child, a young man here who is borderline retarded. I don't know if he can read or write or not.
>
> I was impressed by the fact that he responded properly to Detective Foster when he talked to him and when he read his rights to him. But, you can never convince me that he understood his rights. I think he probably did.[2]
>
> But once he was told that the [victim's] ring was [found] in [his] pocket, and you're gonna have to tell us, and your job is to tell us, I'm going to go to the Commonwealth's Attorney, I don't think . . . that would be a voluntary waiver of his rights.

### Analysis

The Commonwealth contends the trial court erred in suppressing Brown's confession. It claims the trial court erred in finding that Brown did not knowingly, intelligently, and voluntarily waive his rights. For the reasons that follow, we disagree.

On review of a Commonwealth's pretrial appeal of a

---

[2] In the context of the entire record, we treat this apparent inconsistency as a scrivener's error and read this sentence as stating, "I think he didn't."

suppression motion, we consider the evidence in the light most favorable to the party prevailing below, in this case Brown. Grimstead, 12 Va. App. at 1067, 407 S.E.2d at 48. Whether a waiver of Miranda rights was made knowingly, intelligently, and voluntarily is a question of fact. Harrison v. Commonwealth, 244 Va. 576, 581, 423 S.E.2d 160, 163 (1992). Thus, "the trial court's resolution of that question is entitled on appeal to a presumption of correctness." Id. We will not disturb the trial court's factual finding unless it is plainly wrong. Watkins v. Commonwealth, 229 Va. 469, 477, 331 S.E.2d 422, 429-30 (1985) (citations omitted).

"'In order to be able to use statements obtained during custodial interrogations of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation.'" Grogg v. Commonwealth, 6 Va. App. 598, 611, 371 S.E.2d 549, 555 (1988) (quoting Fare v. Michael C., 442 U.S. 707, 717 (1979)); see also Va. Const. art. I, §§ 8 and 11. An accused, including a juvenile, may waive his or her right to remain silent or have counsel present. Fare, 442 U.S. at 724-25.

A waiver, however, is valid only if it is made knowingly, intelligently, and voluntarily. See Miranda v. Arizona, 384 U.S. 436, 475 (1966); Grogg, 6 Va. App. at 611, 371 S.E.2d at 556. "[T]he Commonwealth must demonstrate that the waiver 'not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege . . . .'" Grogg, 6 Va. App. at 611, 371 S.E.2d at 556 (quoting Edwards

- 5 -

v. Arizona, 451 U.S. 477, 482 (1981)). "The courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373 (1979); see also Grogg, 6 Va. App. at 611, 371 S.E.2d at 556 ("Courts must indulge every reasonable presumption against waiver." (citing Brewer v. Williams, 430 U.S. 387, 404 (1977))). Hence, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475; accord Grogg, 6 Va. App. at 611, 371 S.E.2d at 556.

As in all cases where the validity of a Miranda waiver is an issue on appeal, we must consider whether the "totality of the circumstances" supports the trial court's finding on the issue. Fare, 442 U.S. at 725; Grogg, 6 Va. App. at 612, 371 S.E.2d at 556. Such circumstances include "[the accused's] background and experience and the conduct of the police," Correll v. Commonwealth, 232 Va. 454, 464, 352 S.E.2d 352, 357 (1987) (citations omitted), and, in the case of a juvenile, his or her age, education, and intelligence, as well as his or her "capacity to understand the warnings given him [or her], the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Fare, 442 U.S. at 725.

However, because the "admissions and confessions of juveniles require special caution," courts have applied an augmented test to determine whether the juvenile's waiver of his or her rights rights is valid. In re Gault, 387 U.S. 1, 45 (1967). In such cases, the trial court must find that the police "took care to ensure that [the juvenile] understood his rights."

- 6 -

442 U.S. at 726; accord Green v. Commonwealth, 223 Va. 706, 710, 292 S.E.2d 605, 608 (1982) (affirming the trial court's finding that defendant's waiver was knowing and voluntary because "the police exercised the greatest care in seeing Green's rights were protected . . .").

In Fare, the United States Supreme Court affirmed the lower court's finding that the juvenile knowingly waived his Miranda rights because the police read and explained the rights to the juvenile twice, and "ascertained that [he] understood those rights." 442 U.S. at 726. The officer asked the accused, "Do you understand all of these rights as I have explained them to you?" Id. at 710. The defendant responded, "Yeah." Id. The officer then asked, "[D]o you wish to give up your right to remain silent and talk to us about this murder?" Id. After further explanation, the defendant responded, "Yeah, I might talk to you." Id. The officer then asked, "Do you want to give up your right to have an attorney present here while we talk about it?" Id. When the juvenile asked for his probation officer instead, the officer again clarified, "You have the right to an attorney." Id. A few seconds later, the officer repeated, "[W]ill you talk to us without an attorney present?" and the defendant responded, "Yeah I want to talk to you." Id. at 711.

In Virginia, we require the same assurance that a juvenile in police custody has knowingly waived his or her rights before a subsequent confession may be used against the juvenile. In Green, for example, the Virginia Supreme Court found that the Commonwealth established the voluntariness of Green's waiver because "the police exercised the greatest care in seeing Green's

rights were protected." 223 Va. at 710, 292 S.E.2d at 608. The police advised the accused of his Miranda rights three times and twice cautioned him not to make a statement without his mother present. Id. The officer asked Green if he understood the offenses with which he was charged, and Green defined the terms with specificity. Id. at 709, 292 S.E.2d at 607. Only after the officer had thus ensured Green's understanding of his rights and the consequences of waiving them, Green made incriminating statements. Id. at 710, 292 S.E.2d at 608; accord Simpson v. Commonwealth, 227 Va. 557, 564, 318 S.E.2d 386, 390 (1984) (upholding trial court's determination that defendant voluntarily and intelligently waived his Miranda rights because the police read the warning "three times, in clear and simple language, . . . [and] amplified the warnings in words which, in the expert's opinion, [the juvenile] could not fail to understand"); Roberts v. Commonwealth, 18 Va. App. 554, 445 S.E.2d 709 (1994) (upholding trial court's determination that defendant's waiver was knowing where he verbally responded in the affirmative each time the officers asked him if he understood his Miranda rights); Grogg, 6 Va. App. at 615, 371 S.E.2d at 558 (upholding trial court's determination that defendant's waiver was knowing where "[t]he waiver and consent form contained simple, understandable language," and the officer "read each individual Miranda warning and asked [the juvenile] if he understood the right").

This standard for measuring the validity of a waiver of Miranda rights in cases involving juveniles is particularly applicable when neither a parent, guardian, nor counsel is present at the time of the juvenile's waiver. Grogg, 6 Va. App.

- 8 -

at 613, 371 S.E.2d at 557 (the absence of a parent or counsel is "'a circumstance that weigh[s] against the admissibility of the confession'" (quoting Miller v. Maryland, 577 F.2d 1158, 1159 (4th Cir. 1978))); see also Gallegos v. Colorado, 370 U.S. 49, 54 (1962) (the confession of a fourteen year old, obtained in the absence of his parents, violated his right against self-incrimination because such a child "is unlikely to have any conception of what will confront him when he is made accessible only to the police, . . . [and] is unable to know how to protect his own interests or how to get the benefits of his constitutional rights").  Thus, we begin our analysis of the present case noting that neither counsel nor a parent or other independent person was present with Brown during the interrogation, and we look for evidence in the record showing that the police "took care to ensure that [Brown] understood his rights."  Fare, 442 U.S. at 726.

     As made clear by the videotape of the interrogation, which was reviewed by the trial court, Detective Foster not only failed to ensure that Brown understood his rights, he did not ascertain whether Brown, to the extent he was aware that he had constitutional rights during the interrogation, wished to waive those rights.  First, Detective Foster began the presentation of Brown's Miranda rights by admonishing him, "[L]isten to me while I read you these rights.  Don't make any comment to me, don't get mad, don't get abrupt, just listen and then I'll tell you and then you can tell your side of the story."

     Next, he rapidly and without pause read Brown a Miranda form.  He offered neither explanation of the rights nor an

invitation to seek an explanation. Detective Foster's manner in reading the <u>Miranda</u> rights to Brown served to confirm that Brown was to remain silent while his rights were read and that interruptions for clarification would not be tolerated.

Immediately upon reading the last <u>Miranda</u> right printed on the form from which he was reading, Detective Foster said, "You understand these rights?" Brown quickly nodded in the affirmative, and Detective Foster continued, saying, at the same rapid pace, "Understanding these rights and if you wish to waive them and make a statement to me you can if you wish." Then he handed Brown the form and told him, "[S]ign your name here that I read you your rights and that you understand them." Brown followed the directive, which effectively foreclosed his reading the form.

Detective Foster never pointed out that Brown's signature on the form was an indication that he chose to give up his rights.[3] Nor did Foster ask Brown orally whether he chose to give up his rights. The entire procedure from the time Foster began giving Brown his <u>Miranda</u> rights to the time Brown signed the form took less than one minute.

In short, Detective Foster did not ensure that Brown understood that he had a right to remain silent and a right to have an attorney present and that he wished to give up either or both of those rights. In fact, Foster testified that he did not know if Brown understood the meaning of the term "waiver," which

---

[3] In fact, Detective Foster did not read the portion of the form that stated, "I understand these rights and wish to waive them and make a statement."

was the only term used to suggest to Brown that he was giving up his rights.

Evidence apart from the videotaped interrogation also demonstrates that Brown was of low intellectual function, a fact that supports the trial court's conclusion that he did not understand his rights or the consequences of waiving them.[4]  The record shows that the police knew Brown was only fifteen years old with only an eighth grade education; they failed to ascertain his intellectual capacity and functioning, however.  A psychological report prepared to assess Brown's educational needs listed his verbal IQ at 60, his verbal comprehension at 59, and his full scale IQ at 65.  These scores placed his overall intellectual functioning within the range of "significant mental deficiency."  Indeed, the tests indicated that Brown was "struggling with basic phonetic skills,[5] including vowel sound and consonant blends.  In short, his ability to "decode words" was significantly impaired.  These language limitations, considered together with, and in the context of, the manner in which the Miranda rights were presented, including Detective

_____

[4] The Commonwealth contends the trial court incorrectly stated that it was not able to conclusively find that Brown could read.  However, the record indicates that Brown's reading and writing skills were in the bottom one percent of children his age.  Accordingly, the trial court's doubt as to whether Brown could read or write is not unfounded.  Furthermore, since the record establishes that Brown was not given an opportunity to read the waiver form and that he did not read it, the point is moot.

[5] Webster's defined "phonetic" as "of or relating to spoken language or speech sounds."  Webster's Third International Dictionary 1700 (1993).

Foster's failure to determine whether Brown wished to give up his rights, compel us to conclude the trial judge's ruling that he was not persuaded that Brown understood his rights, and that Brown's waiver was neither knowing nor intelligent, is fully supported by the record.

The Commonwealth cites Wright v. Commonwealth, 245 Va. 177, 184, 427 S.E.2d 379, 385 (1993), vacated on other grounds, Wright v. Virginia, 512 U.S. 1217 (1994), and Correll, 232 Va. at 464, 352 S.E.2d at 357–58, to support its proposition that a juvenile of limited intelligence is capable of executing a valid waiver.[6] In each of these cases, however, the facts supported the trial court's finding that the juvenile understood his rights and the consequences of waiving them.  Because Brown's situation differs substantially from the defendants in Wright and Correll, they are not persuasive.

In Wright, for example, the Virginia Supreme Court noted that Wright had experienced a number of prior arrests, his psychologist testified that his test scores did not accurately reflect his "street smarts," and Wright stated specifically that he understood his rights.  Id.  Likewise, the Court in Correll held that the defendant understood his Miranda rights and intelligently waived them because he "had on a number of prior

---

[6] The Commonwealth also argues that our decision in Novak v. Commonwealth supports its position that Brown intelligently waived his rights.  20 Va. App. 373, 386-87, 457 S.E.2d 402, 408-09 (1995).  However, the defendant in Novak was not of limited intelligence.  Rather, the trial court found that Novak was "highly intelligent," and had "a full understanding of the interview process and what was being said and why he was there."  20 Va. App. at 387, 457 S.E.2d at 409.  Consequently, Novak does not support a conclusion that the trial court's finding that was

– 12 –

occasions dealt with the police and received <u>Miranda</u> warnings," and had received them several times in connection with the conviction before the Court.[7]  232 Va. at 464, 352 S.E.2d at 358.

Nothing in the record suggests Brown had significant experience with the police or exhibited "street smarts." Likewise, nothing in the record suggests Brown was familiar with the <u>Miranda</u> warnings or the consequences of waiving them. Although he had prior criminal charges against him in the juvenile system, the record does not indicate that he had ever before been in an interrogation room or received <u>Miranda</u> warnings.

Finally, we conclude that the waiver was not voluntary. First, Brown could not voluntarily give up a right the import of which he did not understand.  Second, Brown was interrogated while in handcuffs, a factor properly considered when determining the voluntariness of the waiver.  <u>Cf.</u> <u>Grogg</u>, 6 Va. App. at 614, 371 S.E.2d at 557 (considering the fact that the juvenile was not in handcuffs during questioning in determining whether the interrogation was coercive).  Further, the detective's manner in

---

plainly wrong.

[7] Brown was also given his <u>Miranda</u> rights at the time of his arrest, although he was not interrogated at that time.  While repeated exposures to <u>Miranda</u> rights may weigh in favor of concluding the defendant knowingly, intelligently and voluntarily waived those rights, <u>see</u> <u>Correll</u>, 232 Va. at 464, 352 S.E.2d at 358, the record fails to show the circumstances under which the rights were first given to Brown, the manner in which they were given, the degree of focus Brown manifested when the rights were read to him, and other relevant factors from which the trier of fact could weigh and evaluate the effectiveness of the presentation and consequent understanding of those rights.  In short, we cannot be certain from this record that Brown understood his rights or the consequences of

giving Brown his rights, which afforded him no opportunity to raise questions or concerns, together with the detective's quick, terse directive to "just listen," and his concluding directive to "sign here," did little to "dispel the compulsion inherent in custodial surroundings." <u>Miranda</u>, 384 U.S. at 458.  Under the facts of this case, a presentation of <u>Miranda</u> rights in this manner can properly be seen as intimidating and coercive.

In conclusion, the evidence, viewed in its totality and in the light most favorable to Brown, supports the trial court's finding that Brown's waiver was not knowing, intelligent, and voluntary.  Accordingly, we affirm the trial court's finding and its suppression of Brown's subsequent statement.  Because we affirm on this ground, we do not address the Commonwealth's contention that the confession was voluntary and thus improperly suppressed.[8]

<u>Affirmed.</u>

---

waiving them from these prior advisements.

[8] This inquiry "differs from the discrete inquiry of whether the waiver was voluntary.  The former requires a determination of whether the procedure was fundamentally fair . . . while the latter requires only a factual inquiry."  <u>Harrison v. Commonwealth</u>, 244 Va. 576, 581, 423 S.E.2d 160, 162 (1992) (citation omitted); <u>accord</u> <u>Kauffmann v. Commonwealth</u>, 8 Va. App. 400, 405, 382 S.E.2d 279, 281 (1989) (assessing the voluntariness of the confession after determining waiver was valid).