# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

    v.

Kelsey Erin Helvenston

December 17, 2009

Case No. (Criminal) CR09-2330

BY JUDGE NORMAN A. THOMAS

    On October 14, 2009, defense counsel filed a Motion to Suppress defendant's March 22-23, 2009, statements to members of the Norfolk Police Department on Fourth, Fifth, and Sixth Amendment grounds. On October 20 and 22, 2009, the Court conducted lengthy proceedings on the suppression

motion. As part of the evidentiary presentation, the Court reviewed six separate DVD recordings of defendant's several hours of questioning by homicide detectives. Finally, after the filing of additional legal briefs respecting the suppression motion, the Court heard final argument from counsel on November 30, 2009.

The Court has considered all of the evidence and arguments submitted by the parties. It also has taken time to carefully review the numerous cases cited by counsel and to conduct additional legal research. From a factual standpoint, the Court has considered the record holistically, taking into account the totality of the circumstances surrounding defendant's statements of March 22 and 23. For the reasons that follow, the Court grants defendant's Motion to Suppress.

Defendant seeks to suppress her statements on three grounds. First, she contends that her statements were not voluntary because she did not adequately understand her Fifth and Sixth Amendment rights (hereinafter "Miranda rights") as explained to her by detectives and because their interrogation tactics negated the voluntariness of her statements. Second, defendant contends that, although her initial submission to police questioning was consensual, the detectives ultimately interrogated her under a *de facto* arrest without probable cause to do so, thereby violating the Fourth Amendment. Third, defendant argues that the police failed to honor her invocation of her Fifth Amendment right to cease further questioning, which she invoked during the course of her custodial interrogation and prior to her challenged statements.

In the sections that follow, the Court will discuss its factual conclusions and each of defendant's legal arguments.

### Factual Findings

The Court will not endeavor to catalog the entire factual record of the suppression motion, or even to make reference to all facts relevant to its decision to grant that motion. However, it will provide an overview of the factual record and summarize its conclusions resulting from its consideration of that record.

The indictments allege that Defendant used a firearm to commit the second-degree murder of Anthony Sanderlin, a/k/a "Bump," (hereinafter "Sanderlin" or "Bump"), on March 21, 2009. The shooting took place at Sanderlin's apartment home, located at 7433 Fenner Street in Norfolk. In the hours immediately following Sanderlin's death, Norfolk homicide detectives D. R. Jarvis and R. G. Smith received the case assignment and traveled to the

Fenner Street location. They arrived at approximately 8:00 a.m. and toured the purported crime scene. They entered Sanderlin's small upstairs apartment and surveyed each of its rooms. Jarvis described their observations at the suppression hearing, and the Commonwealth introduced a number of photographs to corroborate his account. The detective noted a considerable amount of blood stains and smears in the living room and kitchen areas. They noticed bullet holes in the refrigerator and the presence of five cartridge cases on the floor behind a reclining chair. A blood trail led from the apartment and down a stairwell. The detectives saw blood stains on one or more cars parked in front of the apartment building. The blood trail ended at an outdoor brick stoop several yards' distance from the stairwell descending from Sanderlin's apartment. The detectives learned that Sanderlin sought a neighbor's assistance at that location before he expired. Additionally, the detectives spoke to an apartment complex resident with the last name, "Carter," who witnessed events proximate to Sanderlin's shooting. He described having seen from his window a white vehicle from which three persons exited and walked into the stairwell leading to his apartment. One of the three was Sanderlin, one he described as an attractive Hispanic or white female, and the third he described as a male wearing a gray "hoodie." Jarvis then recounted Carter's further statement:

> He said they walked into the apartment. He said shortly — minutes — or seconds, several seconds later, minutes, he said he heard several gunshots. He said, at that point, the female ran out of the apartment building, got into the car, backed it up to the door in front of a rusty vehicle with a rusty top that was parked in front of the apartment building and waited. And shortly, a minute later, the male that was in the passenger seat came running downstairs. At that point, he said the vehicle drove off and went down Guy Street. At that point later, he said that is when he heard the victim, Mr. Sanderlin yells for help, went downstairs, and attempted to call 911.

Transcript of Proceedings, pp. 109-10.

In the hours that followed, Jarvis and Smith undertook further investigation. They obtained cellular telephone records for Sanderlin and noted calls made to defendant's cell phone in the time immediately preceding Sanderlin's death. The detectives sought to speak with defendant, a seventeen year old Caucasian female, who they learned had previously been charged with an alcohol-related driving offense in Norfolk. After trying to contact

defendant by telephone and traveling to both her Virginia Beach home and her Lynnhaven Mall restaurant job site, the detectives finally met with defendant at her home at approximately 8:30 p.m. March 22, 2009. They noted that she drove a light-colored Chevrolet Impala.

The detectives asked defendant if she would agree to speak with them at the Norfolk Police Operations Center, and she agreed to do so. They did not specify to defendant the subject matter about which they wished to speak to her; they told her only that it was about events that had occurred in Norfolk. They allowed her opportunity to communicate with her mother and then followed her to Norfolk. Defendant drove her own car and, while en route, she purchased seven dollars of gasoline at the detectives' expense. Jarvis recalled observing defendant use her cell phone during the drive.

Upon arrival at the Police Operation Center, the detectives placed defendant into an interview room. They allowed her to keep her personal belongings. They confirmed that the car belonged to defendant, albeit titled to her mother, and that defendant normally drove it. She and the detectives chatted casually during this time. At one point, Jarvis exited the interview room and called defendant's mother. Defendant's mother acknowledged that her daughter had notified her that she was on her way to speak with the police. Jarvis did not disclose to defendant's mother his and Smith's intention to question defendant about Sanderlin's death.

Within a short time after Jarvis' conversation with defendant's mother, he and Smith began questioning defendant in the interview room. Early on, defendant acknowledged to them that she had traveled to Norfolk on the night of Friday, March 20, 2009, with her sixteen-year-old boyfriend, Shawn Hunter. She told them that she had gone to Norfolk to drop off a cell phone. Based upon this information, the detectives decided to Mirandize her.

At the time of her questioning, defendant was a high school senior in Virginia Beach, earned good grades and was scheduled to graduate on time. She planned to attend college. She held a part-time job and satisfactorily managed her own finances. She appeared well-groomed, well-spoken, polite, respectful, and articulate. She professed faith in God and indicated that she maintained an active church life. Defendant experienced great tragedy in her life when, on March 31, 2004, her father, with whom she was close, was killed in Iraq during military-related operations. The record is not clear whether he was in active duty military service at the time of his death, or instead worked for the "Blackwater" security company. In any event, his death in Fallujah, Iraq, garnered substantial publicity in the United States, especially locally, due to the desecration and hanging of his body by enemy combatants.

Defendant previously had encountered the Norfolk police and court system. On September 26, 2008, Officer M. Millard, while working in the vicinity of Old Dominion University, observed defendant driving erratically and stopped her car. At the time, she was with two young African American males. One of them was the subject of an arrest warrant in Virginia Beach for possession with intent to distribute a controlled substance. The other passenger had no warrants, but Officer Millard indicated that he was known to police for gang-affiliated activities. During this traffic stop, defendant somewhat manipulated Officer Millard regarding her father's tragic death:

> She stated that her father was killed in Iraq last month, and described him to me, that he was the one in Blackwater and hung from the Fallujah bridge, and I apologized to her that that happened. I said, Well, I said, you really shouldn't be drinking and driving. In light of the things that happened, I understand maybe some of the stress that you're certainly under. I said, I can't begin to imagine that. I said, but drinking and doing something like this is very dangerous.

Transcript of Proceedings, p. 194.

Officer Millard chose not to arrest defendant for driving under the influence of alcohol, but instead charged her with less serious misdemeanor offenses, called her mother, and waited with her until her older brother arrived to take her home. The case proceeded to Norfolk Juvenile and Domestic Relations District Court, where defendant, represented by counsel, unsuccessfully filed a suppression motion relating to Officer Millard's traffic stop. The case ultimately proceeded to disposition; however, this hearing record does not disclose the result of each misdemeanor charge.

Viewed in totality, the Court finds that, on March 22 and 23, Defendant presented to Norfolk detectives as a mature and intelligent young woman. Indeed, based upon her life circumstances and the activities in which she engaged, along with the broad freedom and parental liberality her mother afforded her, defendant was worldly and street-wise beyond what one might expect for an individual of her age.

Defendant signed her legal rights advice form at 10:05 p.m. on March 22; the form contains enumerated statements of her Miranda rights. *See* Commonwealth's Exhibit 2, Norfolk Police Department Legal Rights Advice Form (PD381). The form correctly articulates those rights. Jarvis testified that Smith endeavored to additionally explain to defendant a waiver of her rights:

Do you understand that you have the right to talk to a lawyer and have a lawyer present during any and all questioning if you so desire? Her response was, You all buy me a lawyer. . . . On line 6, Detective Smith explained that to Kelsey, which says, I further state that I waive these rights and desire to make a statement. Detective Smith tells her she is not giving up her rights, that it means that she is agreeing to speak with us, and that, if there is a question that she does not want to answer, she does not have to answer that, and no one would be mad at her or hold it against her. . . . Like I said, it just said she's agreeing to speak with us. She is not giving up her rights. She is agreeing to speak with us. If there is a question she does not want to answer, she does not have to answer it and that no one will be mad or hold it against her. Smith goes on to tell her that she can quit speaking to detectives at any time.

Transcript of Proceedings, pp. 63-64.

At 10:10 p.m., the detectives briefly exited the interview room to turn on a video camera. Over the course of six DVDs, that recorder documented the next 10 to 12 hours, recording both defendant's discourse with the detectives and significant periods of time when she was alone in the interview room. After approximately 3.5 hours of questioning, defendant began to make inculpatory statements regarding her involvement in Sanderlin's shooting death.

Defendant went on to state that, shortly after her arrival at Sanderlin's home with him and Hunter, Hunter left the living room to take a shower in the bathroom adjoining Sanderlin's bedroom. After Hunter's departure, Sanderlin, whom defendant described as a very large, drug-dealing gang member, expressed his long-standing sexual desire for defendant and attempted to rape her. According to defendant, Sanderlin, with a loaded pistol tucked into the waistline of his pants, stood above her as she sat on a couch. Sanderlin pinned-down defendant's arms and then released one of them while trying to reach into her pants. Defendant immediately grabbed the pistol and fired it into Sanderlin's torso until its magazine emptied. She and Hunter, who exited Sanderlin's bedroom upon hearing the shots, then fled the apartment. She said that Hunter disabled Sanderlin's cell phone and took the gun with him as he left; Hunter later disposed of the pistol at an unknown location.

During the early morning hours of March 23, defendant gave a tape-recorded statement to Jarvis and Smith, which a stenographer then transcribed and defendant, after reviewing it and making numerous corrections, signed at

7:04 a.m. The statement included two diagrams, one depicting Sanderlin's apartment and the other depicting the parking lot outside of his apartment. Jarvis appeared before a juvenile intake officer at approximately 9:40 a.m. and obtained petitions charging defendant with second-degree murder and use of a firearm in commission of that offense.

At the outset of police questioning, defendant was coy and deceptive, serving only to convince Jarvis and Smith that she was present at the time of Sanderlin's shooting and that she was holding back information about the circumstances surrounding it. She repeatedly asked questions such as: "Who died?" "Can you explain to me what happened?" "If I knew, why would I ask you? That's stupid. That's dumb." "Why would I ask you if I know?" "I want you all to prove it to me." "You're telling me I'm getting lined up in somebody's death?" "I don't know what happened. But if you all told me what happened then maybe I could help you, but I don't — I have no idea." "Why would I kill somebody?" "I couldn't even think about killing somebody out of my life." "I don't play games." "I have no idea. It was Bump, he died?"

Jarvis testified that, meanwhile, the detectives utilized tactics intended to let defendant know that they knew that she was lying, to impress upon her the seriousness of the matter about which they were questioning her, to convince her that her situation was a dire one, and to cause her to reveal her knowledge of Sanderlin's death. They politely discussed certain background information with her regarding her relationships with Sanderlin and Hunter, urged her not to play games with them, implied that she was covering-up for Hunter and that she should not do so, pleaded with her for honesty, compared her to other persons they had met and even to members of their own families, asked her to consider her future, described at length the hardships of prison life, revealed some details of their investigation that led them to question her, implored her not to be heartless respecting her knowledge of the events, warned her of the peril of her personal responsibility for the events, and discussed with her the tragedy of her own father's death. One additional tactic eventually led defendant to make inculpatory statements. The successful tactic involved researching Sanderlin's lengthy criminal history and then vilifying him to her while beseeching her to tell them what bad things Sanderlin either did or attempted to do to her in his apartment on the night of the shooting.

Throughout these initial hours of the interview, the detectives also made statements that increasingly implied that defendant was in their custody. For example, the detectives said: "Having said that, though, to you and listen to what you said, what my job is going to be now is to make sure I'm putting you in prison." "I'll need your cell phone now. I need your cell phone." "[W]e're going to have a female officer come in here and take your things away from

you, your earrings, your necklace, your cell phone, and then they're going to advise you that you are not going home and that you're going to be in some stuff. I think that's what's it's probably about to take and I don't want you to do that. I want you to hear — I want you — to live your life — you have to live, Kelsey." Other statements included the following: "You're going to be fine (inaudible) school does not exist for you anymore." "In a second, I'm going to come back in. We will take your cell and everything else from you, ok, and that will be pretty much it. Okay? Alright? Because I am done playing games with you." "You're making all kinds of bad choices. I'm going to go contact the magistrate. I'm going to get everything rolling. I'm done with it." "I going to go ahead and take your jewelry and stuff, okay, and your rings and your phone. That's got to go."

Notwithstanding the intensity of the interview, the detectives allowed defendant to use the restroom when she requested to do so, offered her food and drink, and urged her to stop her nearly incessant fingernail biting. Defendant, although repeatedly denying having done anything to Sanderlin or knowing anything about his death, remained polite and expressed understanding of the detectives' need to fulfill their duty to determine the cause of Sanderlin's death.

As Jarvis and Smith progressed through the array of interrogation tactics, defendant began to protest. She made several statements signaling a growing reluctance to continue submitting to their questions. For example, approximately twenty-five minutes into the interview the following exchange took place:

Jarvis: Kelsey, Kelsey, Kelsey, sit, sit, sit down. I'll need your cell phone now. I need your cell phone.

Defendant: For what reason?

Jarvis: Because you can't have your cell phone in here.

Defendant: I'm leaving.

Jarvis: Kelsey, listen to me. It's changed. Okay? But I want you to understand is there's people — this is not an accident, sweetheart, it's not an accident.

Commonwealth's Exhibit 1, Interview of Kelsey Helvenston, p. 17.

As defendant uttered the words, "I'm leaving," she stood up from her chair and began to walk towards the door. Jarvis motioned her back to her seat and she returned to it. He did not actually take her cell phone at that time. In fact, it was some time later before the detectives had her place her cell phone and other belongings inside a manila envelope and placed it on the table. On at least one occasion, when left alone, defendant retrieved the phone from the manila envelope, used it briefly either to send a text message or to read something on the phone's screen, and then replaced the phone inside the envelope. These events took place within the first two hours of her interview.

Following her attempt to exit the interview room, defendant made such statements as: "I have school in the morning." "Is there any way I can leave without (inaudible) in the same room?" "I just want to go home." To this latter statement, Smith replied, "I don't know if you do." Later during the questioning, but before admitting to shooting Sanderlin, defendant asked, "So you all going to lock me up tonight?" and "Can we stop talking?" After approximately three hours of questioning and approximately one-half hour after her question whether they could stop talking, the following dialogue occurred:

> Jarvis: Did he try to touch you? What did this bad dude do? Please, Kelsey, tell me. What did he do to you? Did he hit you? Kelsey, Kelsey, please look at me. Kelsey, please, did he hit you?
>
> Defendant: I want to stop talking about it.

Commonwealth's Exhibit 1, Interview of Kelsey Helvenston, p. 73.

Jarvis did not pause in his questioning after this statement. He implored her not to let Sanderlin continue to hurt her by what he had done, further vilified Sanderlin, and told her of his previous experience as a rape investigator. He continued urging her to speak and, within the next few minutes, she uttered such statements as, "I was so overwhelmed." "I really need to go to sleep tonight." The detectives then began a new interrogation tactic, telling defendant that they had called their Sergeant who was on his way to the Police Operations Center and implied that when he arrived her situation would worsen. At one point, defendant asked if the detectives had called her mother and Smith replied that they had not done so. Just moments before making inculpatory statements, defendant and Smith conversed as follows:

Defendant: I did not do anything.

Smith: Then tell us what happened because I'm telling you, you're looking at a murder charge.

Defendant: But I didn't do anything.

Smith: Then tell us what happened. Murder is not — let's see, murder, use of a firearm. Whoa, there's another one, conspiracy, there's another one. They stack up.

Commonwealth's Exhibit 1, Interview of Kelsey Helvenston, p. 81.

The detectives pressed on, urging defendant to tell them what Sanderlin had done to her. At page 85 of the interview transcript, some 3.5 hours into the interview, defendant stated, "He tried to rape me," and after a bit more urging, unfolded her story about how and why she shot Sanderlin.

In the moments preceding her incriminating statements, defendant had become tearful. Detectives consoled her, offered her tissues, and defendant regained her composure. Throughout the balance of the night, as she divulged more details of her account, she would temporarily lose and regain her composure. When left alone in the interview room, she sometimes became particularly distressed. Yet, when she made the tape-recorded statement that she later signed in transcribed form, she was remarkably composed. Defendant drew two diagrams to illustrate portions of her account of events and approached her review of the transcribed statement as she would a school examination, commenting "I know it's like it's test paper." She continued to make statements implying that she expected to go home that night and to attend school the next day. Defendant declined all offers of food and drink, explaining that the medications she took for attention deficit disorder robbed her of her appetite.

Immediately after she signed her statement, just past 7:00 a.m. on March 23rd, Jarvis revealed to her that she would be charged with Sanderlin's murder and with the use of a firearm. At this revelation, defendant became quite emotionally upset and remained so for an extended period of time. Eventually, she angrily and profanely sought to disavow her statements to the detectives. In a telephone conversation with her mother just after 11:00 a.m. on March 23rd, defendant both disavowed her statement and claimed that the detectives had deceived her into making it and had supplied its content to her. Among the statements made to her mother, defendant said:

They wouldn't let me talk to anybody, I didn't even know I could get a lawyer. I just asked, I said, can I call my mom? Can I call somebody, my brother? I didn't know what to do. I've never had to make a decision like this before. I've never been in this position before. I didn't kill him. Why would I kill him? I'm going through this for no reason because I confessed to a murder I didn't even do. Mom, I love you. Are you even coming to see me at the group home today? Can I ask them if you're allowed to take me to the group home?

Commonwealth's Exhibit 1, Interview of Kelsey Helvenston, pp. 186-87.

## Voluntariness Issues

With respect to the voluntariness of her statement, defendant contends that the Commonwealth fails in its burden to show that she both understood her Miranda rights and, in making her statements, did so as a product of unconstrained choice not overborne through use of coercive police tactics. These are legal issues upon which the Commonwealth bears "a heavy burden"; however, a trial court must resolve factual issues in determination of these Fifth and Sixth Amendment issues. *See Burket v. Commonwealth*, 248 Va. 596, 611, 450 S.E.2d 124, 132 (1994), *cert. denied*, 530 U.S. 1053 (1995); *Rodriguez v. Commonwealth*, 40 Va. App. 144, 156–57, 578 S.E.2d 78, 83–84 (2003); *Mills v. Commonwealth*, 14 Va. App. 459, 468, 418 S.E.2d 718, 722–23 (1992); *Grogg v. Commonwealth*, 6 Va. App. 598, 611–12, 371 S.E.2d 549, 556 (1988).

With respect to the voluntariness of a juvenile's statement, a court must undertake an "evaluation of [the] juvenile's age, experience, education, background and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Grogg, supra*, 6 Va. App. at 611–12, 371 S.E.2d at 556, *quoting Fare v. Michael C.*, 442 U.S. 707, 725 (1979), and *citing Harris v. Commonwealth*, 217 Va. 715, 719–20, 232 S.E.2d 751, 754–55 (1977); *Green v. Commonwealth*, 223 Va. 706, 710, 292 S.E.2d 605, 607–08 (1982). *See also Cary v. Commonwealth*, 40 Va. App. 480, 487–88, 579 S.E.2d 691, 694–95 (2003).

Once a voluntary, knowing and intelligent waiver of Miranda rights is made, that waiver will be presumed to remain in effect during subsequent custodial interrogation unless and until the defendant, "in some way which

would be apparent to a reasonable person," expresses a desire to revoke that waiver. *Washington v. Commonwealth*, 228 Va. 535, 548–49, 323 S.E.2d 577, 586 (1984), *cert. denied*, 471 U.S. 1111 (1985).

In the case of a juvenile, while courts encourage police to obtain the presence of a parent during questioning, the presence or absence of a parent, standing alone, is not determinative of whether the suspect's statement is voluntary. *See Cary, supra*, 40 Va. App. at 488–89, 579 S.E.2d at 695; *Roberts v. Commonwealth*, 18 Va. App. 554, 557, 445 S.E.2d 709, 711 (1994); *Grogg, supra*, 6 Va. App. at 613, 371 S.E.2d at 557.

As stated in the *Rodriguez* case:

> In determining whether an individual has voluntarily, knowingly, and intelligently waived his Miranda rights, a court must conclude the relinquishment of the right [was] voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. . . . The waiver must [also] have been made [knowingly and intelligently,] with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 . . . (1986). Proof of "coercive police activity is . . . a necessary predicate to finding that a waiver of Miranda rights is not voluntary." *United States v. Cristobal*, 293 F.3d 134, 141 (4th Cir. 2002). . . .

Assessing whether a confession is voluntary requires an examination of the totality of the circumstances to determine whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will "has been overborne and his capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 . . . (1973). Just as in assessing whether the waiver of one's Miranda rights was knowing and intelligent, a court determining whether a confession was voluntary must consider both "the details of the interrogation" and "the characteristics of the accused." *Kauffmann v. Commonwealth*, 8 Va. App. 400, 405, 382 S.E.2d 279, 281 (1989). Such factors include "the purpose and flagrancy of any police misconduct," "the length of the interview," and any "moral and psychological pressures to confess emanating from official sources." *Morris*, 17 Va. App. at 579, 439 S.E.2d at 870. As with the assessment of the voluntariness of a waiver of Miranda rights, "coercive police activity is a necessary predicate to finding that a confession is not 'voluntary.'. . ." *Colorado v. Connelly*, 479 U.S. 157, 167 . . . (1986).

*Rodriguez, supra,* 40 Va. App. at 156–58, 578 S.E.2d at 83.

Turning first to the issue whether defendant correctly understood and voluntarily waived her Miranda rights, the Court concludes that the Commonwealth met its preponderance burden to establish that she did so. *See Mills v. Commonwealth,* 14 Va. App. 459, 468, 418 S.E.2d 718, 722–23 (1992). She reviewed the legal rights advice form with the detectives, responded appropriately to their questions regarding her understanding of it, filled it out properly, and signed it. The detectives did not coerce or seek to pressure her in any way. The Court finds that she gave it an appropriate level of attention and correctly comprehended both her Fifth and Sixth Amendment rights as explained therein and also the consequences of waiving those rights. Although defendant complains that Smith did not correctly explain the content of Line 6 of the form, the Court finds that his comments did not mislead her or otherwise negatively affect her comprehension of her Miranda rights or the consequences of waiving them. Her decision to waive those rights was the product of free and unconstrained choice.

The Court thus turns to the defendant's second contention respecting the voluntariness of her statement, that is, that the police tactics utilized during the questioning negated the voluntariness of her statement. As noted in *Kauffmann, supra,* 8 Va. App. at 405, 382 S.E.2d at 281, a purported confession, "even if obtained in full compliance with *Miranda* may be inadmissible if it was not voluntary."

The Court notes at this juncture its finding that, when defendant initially met with the detectives, she was not in custody. She willingly went with them to the Police Operations Center and advised her mother that she was doing so. Although detectives did not tell defendant or her mother that they intended to question her about Sanderlin's death, that fact does not alter the consensual nature of her encounter with the police. Nevertheless, as discussed in more detail below, the Court concludes that defendant's interview evolved early-on into a custodial interrogation. With respect to the voluntariness inquiry, its suffices to say that the transition had occurred well before the defendant made statements implicating herself in Sanderlin's shooting.

In a case presenting the complexities of this one, the Court takes seriously its responsibility to review and maturely consider the totality of the circumstances in deciding voluntariness issues. The Commonwealth's burden is to establish voluntariness, if it can, by a preponderance, that is, the greater weight of the evidence considered as a whole. The Court concludes that it has done so and holds that the defendant's statement met the constitutional standards for voluntariness. *See Mills, supra,* 14 Va. App. at 468, 418 S.E.2d

at 723. As the Court discussed with counsel during final arguments, there is a qualitative difference between the police utilizing interrogation tactics to overcome a suspect's will to resist making incriminating statements and whether police misconduct or coercive tactics so significantly affected a suspect that his or her subsequent statement is not the product of "free and unconstrained choice" or that his or her will was overborne and "capacity for self-determination critically impaired." *See Cary, supra,* 40 Va. App. at 487, 579 S.E.2d at 694, *citing Stockton v. Commonwealth,* 227 Va. 124, 140, 314 S.E.2d 371, 381 (1984), *quoting Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973).

On the night she was questioned, defendant was an intelligent, mature, and articulate college–bound teenager who enjoyed the full measure of her mother's confidence and trust in matters of her own affairs. She managed those affairs with relative competence, and her lifestyle and the manner in which she conducted herself were more confident, independent, and "savvy" than many adults. In this regard, the absence of her mother from, and her mother's lack of information about, the nature of the police interrogation do not effect the voluntariness of defendant's statements.

Without question, Jarvis and Smith employed an array of relatively aggressive tactics which, in the end, resulted in defendant yielding in her efforts to deny knowledge of Sanderlin's death and admitting direct responsibility for it. Moreover, the detectives' escalation of the interview into a custodial interrogation constituted an improper coercive tactic, as more fully discussed in the following section of this opinion. At the same time, the evidence convinces the Court that she "was fully cognizant of [her] situation, was in control of [her] cognitive powers, understood the circumstances, and was exercising [her] free will when [she] admitted [her] involvement in the crime. . . ." *Bottenfield v. Commonwealth,* 25 Va. App. 316, 328, 487 S.E.2d 883, 889 (1997) (clarifications added), *quoting Wilson v. Commonwealth,* 13 Va. App. 549, 554, 413 S.E.2d 655, 658 (1992). The Court further concludes that her inculpatory statements were genuine, and it entirely discounts her subsequent attempts to disavow either the content of her statements or her understanding of her Fifth and Sixth Amendment rights.

*Fourth Amendment Issues*

Defendant argues that the police held her for custodial interrogation absent probable cause to arrest her and in violation of her Fourth Amendment right against unreasonable seizure of her person. The Commonwealth appears to concede that defendant's interview with police escalated into a deprivation

of her personal liberty. However, it argues that the restraint on her liberty constituted nothing more than a constitutionally permissible investigative detention until she sufficiently inculpated herself and thereby provided the detectives with probable cause to formally arrest her. The Court agrees with defendant's position on this matter.

Constitutional jurisprudence recognizes the concept of an "investigative detention" of an individual that lies between a full or *de facto* arrest, for which probable cause must exit, and a mere "stop and frisk" as permitted by the landmark case of *Terry v. Ohio*, 392 U.S. 1 (1968). *See Hayes v. Florida*, 470 U.S. 811, 814–15 (1985). The hallmarks of an investigative detention are "articulable facts supporting a reasonable suspicion that a person has committed a criminal offense," which enable the police to stop that person, "in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Id.* at 816 (citations omitted). Two key attributes of an investigative detention, founded on appropriate factual circumstances, are diligence and brevity. That is, the police, in detaining an individual, must act with reasonable dispatch to investigate their suspicions in a manner that minimizes the duration of the deprivation of liberty. *See discussion, United States v. Sharpe*, 470 U.S. 675, 683–86 (1985). As noted in that decision:

> Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. But our cases impose no rigid time limitation on *Terry* stops. While it is clear that the "brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on a reasonable suspicion," *United States v. Place*, [462 U.S. 696, 709 (1983)], we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. . . . Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.

*Sharpe*, 470 U.S. at 685 (citations omitted).

The government may not constitutionally justify a purported investigative detention when the conditions of it equate to a *de facto* arrest. In *Florida v. Royer*, 460 U.S. 491 (1983), the Court made clear this limitation:

> *Terry* and its progeny nevertheless created only limited exceptions to the general rule that seizures of the person require probable cause to arrest. Detentions may be "investigative" yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not . . . seek to verify their suspicions by means that approach the conditions of arrest.

*Id.* at 499 (citation omitted).

In addition, in *Dunaway v. New York*, 442 U.S. 200 (1979), the Court interpreted its existing precedent to mean, "that detention for custodial interrogation — regardless of its label — intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Id.* at 216. While the outcome of the relevant Fourth Amendment analysis has varied in individual cases based upon the circumstances presented therein, Virginia's courts recognize and follow this constitutional rule. *See Addison v. Commonwealth*, 224 Va. 713, 718–19, 299 S.E.2d 521, 523–24 (1983); *Ford v. Commonwealth*, 28 Va. App. 249, 257–58, 503 S.E.2d 803, 806–07 (1998); *Limonja v. Commonwealth*, 8 Va. App. 532, 542–43, 383 S.E.2d 476, 482 (1989); *DePriest v. Commonwealth*, 4 Va. App. 577, 585–86, 359 S.E.2d 540, 545 (1987); *Commonwealth v. Collins*, 53 Va. Cir. 289, 290–91 (Norfolk 2000).

In addition, if the police hold an individual for custodial interrogation absent probable cause and through that device obtain an incriminating statement from that person, the Court must suppress that statement. That is, if a causal relationship exists between the unlawful detention and the procurement of the inculpatory statement, the exclusionary rule applies to that statement. *See Brown v. Illinois*, 422 U.S. 590, 601–03 (1975). As noted in *Dunaway*:

> Consequently, although a confession after proper *Miranda* warnings may be found "voluntary" for purposes of the Fifth Amendment, this type of "voluntariness" is merely a "threshold requirement" for Fourth Amendment analysis.

*Dunaway*, 442 U.S. at 217, *quoting Brown*, 422 U.S. at 604.

As noted above, the Court concludes that defendant's interview with police commenced as a consensual encounter and progressed into a custodial interrogation. Thus, it must now particularize when the custodial interrogation

began for purposes of determining which of her subsequent statements will be suppressed. In *Novak v. Commonwealth*, 20 Va. App. 373, 457 S.E.2d 402 (1995), the Court articulated the applicable legal standards:

> In determining whether an individual was in custody, a court must examine all the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether their [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . In this analysis, the situation must be viewed from the vantage point of how a reasonable man in suspect's position would have understood his situation.

*Id.* at 385, 457 S.E.2d at 407–08, *quoting Stansbury v. California*, 511 U.S. 318, 322 (1994); *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

The Court finds that defendant's interview escalated into a custodial interrogation during its second hour, at or immediately prior to the time that her cell phone and other of her personal effects were involuntarily taken from her and placed in a manila envelope. Commonwealth's Exhibit 1, Interview of Kelsey Helvenston, p. 50.

Among other significant events leading to this point in time, the Court finds the following occurrences especially relevant to its determination. The detectives formally Mirandized defendant; Smith told her that his "job" now would be to "make sure" that she went to prison (p. 16); she was prevented from leaving the interview after stating an intention to do so, leaving her seat and proceeding toward the interview room door (p. 17); the detectives accused her of lying (pp. 23, 28); the detectives had demurred to her statement that she wanted to go home when Smith replied, in part, "I don't know if you do." (p. 29); the detectives repeatedly threatened an intent to take her phone and personal belongings (pp. 13, 34, 38, 40, and 49); Jarvis told her, "school does not exist for you anymore" (p. 35); the detectives required her to utilize the rest room only when accompanied by a female officer (pp. 36, 38); Jarvis had purported to give his "last warning" to her (p. 35); Jarvis strongly objected to her text messaging while in the bathroom (pp. 38, 39); and Smith vividly described prison life to her (pp. 43–46). Jarvis testified that he and Smith intended for these tactics, and others, to escalate in defendant's mind the seriousness of her personal situation, the gravity of the matter under investigation, and, in short, to convince her to stop concealing what she knew about Sanderlin's death. However, in so doing, and culminating in the actual demand for her phone and personal belongings, the detectives placed her in a situation where any reasonable person in her position would perceive such

restraint on their individual freedom of movement as to equate to an arrest. Defendant was not free to leave, the Court concludes, and could not reasonably have perceived that she was free to do so. The circumstances constituted a *de facto* arrest.

In addition, at that critical point in time, the detectives lacked probable cause to arrest defendant. While she had made certain admissions that rightfully raised the detectives' interest in her knowledge of Sanderlin's death and, along with other investigative evidence, caused them to suspect her complicity in it, up to that time she had denied knowledge of or involvement in Sanderlin's death.

The fact that defendant, at various times during the subsequent hours, apparently hoped or even thought that she might be allowed return home does not affect the Court's conclusion respecting the advent of custodial interrogation. Indeed, during her time with the detectives, defendant variously appeared to recognize her custodial status yet likewise anticipate a return home. First, the Court must apply, as it has done, the applicable constitutional standard. Its determination does not stand on efforts to interpret defendant's somewhat conflicting and purely subjective manifestations. Second, the Court notes that her inculpatory statements, wherein she admitted shooting Sanderlin in an attempt to prevent him from raping her, led her to believe that she did not confess to "murder" and therefore should be entitled to go home.

Whatever circumstances might properly constitute an investigative detention, indefinitely holding an individual inside a police interview room under circumstances constituting a *de facto* arrest do not fulfill that definition. Such was defendant's situation in this case, and the Court finds a direct causal relationship between the violation of her Fourth Amendment liberty interests and the procurement of her incriminating statements. The police lacked the probable cause necessary to justify defendant's custodial interrogation at the moment they took her cell phone and personal effects, necessitating that the Court suppress any statements made by her after that time.

### Invocation of Right to Remain Silent

The Fifth Amendment standard governing the clarity with which an individual subject to custodial interrogation must articulate a desire to terminate questioning is relatively easy to state, yet more difficult to apply. Every case presenting that question possesses its own unique set of facts and circumstances, and a court must examine them in their entirety to reach a decision. In this case defendant contends that she invoked her right to remain silent, requiring the police to cease questioning her, after approximately three

hours of interrogation when she stated "I want to stop talking about it." Commonwealth's Exhibit 1, Interview of Kelsey Helvenston, p. 73 (line 21). The Commonwealth counters that her utterance related only to one particular line of interrogative questioning and did not constitute an invocation of her right to terminate all questioning. Once again, the Court considers the matter in light of the totality of circumstances relating to her quoted statement in order to determine its proper context. Having done so, the Court finds that defendant intended to, and in fact, did, invoke her Fifth Amendment right against self-incrimination by her statement, which invocation the detectives did not to honor.

The detectives gave defendant her Miranda rights, in writing, and, as noted above, the court finds she both understood them and voluntarily waived them. According to Jarvis, Smith undertook to clarify the consequences of her waiver when he used words to the effect that, "it means that she is agreeing to speak with us, and that if there is a question that she does not want to answer, she does not have to answer that, and no one will be mad at her or hold it against her . . . that she can quit speaking to detectives at any time." Commonwealth's Exhibit 1, Interview of Kelsey Helvenston, pp. 63–64. Having obtained her waiver, the law obligated the detectives to thereafter "scrupulously honor" the defendant's right to cut off questioning. *Lamb v. Commonwealth*, 217 Va. 307, 312, 227 S.E.2d 737, 741 (1976), *quoting and citing Michigan v. Mosley*, 423 U.S. 96, 104 (1975); *Miranda v. Arizona*, 384 U.S. 436, 474, 479 (1966). *See also Akers v. Commonwealth, supra*, 216 Va. 40, 45–46, 216 S.E.2d 28, 31 (1975).

In *Green v. Commonwealth*, 27 Va. App. 646, 500 S.E.2d 835 (1998), the Court stated:

> Where a person is Mirandized and gives a knowing and intelligent waiver of his right to remain silent, "such waiver will be presumed to continue in effect throughout subsequent custodial interrogations until the suspect manifests, in some way which would be apparent to a reasonable person, his desire to revoke it." *Washington v. Commonwealth*, 228 Va. 535, 548–49, 323 S.E.2d 577, 586 (1984). . . .
>
> The Virginia Supreme Court has declared that a clear and unambiguous assertion of the right to remain silent or to counsel is necessary before authorities are required to discontinue an interrogation. *See Midkiff v. Commonwealth*, 250 Va. 262, 266, 267, 462 S.E.2d 112, 115 (1995); *Mueller v. Commonwealth*, 244 Va. 386, 396–97, 422 S.E.2d 380, 387 (1992).

*Green,* 27 Va. App. at 646, 500 S.E.2d at 838.

The clarity required to end questioning represents perhaps one of the most fertile battlegrounds in Fifth Amendment litigation. Many cases exist that discuss a criminal defendant's utterance and find it lacking the necessary specificity to require cessation of police questioning. Often, Courts finds that while the defendant had reservations about continuing the interview, his or her expression of such reservations did not rise to the level of a Fifth Amendment invocation. *See, e.g., discussion, Mitchell v. Commonwealth,* 30 Va. App. 520, 527, 518 S.E.2d 330, 334 (1999). In *Mitchell,* the Court said that, "[o]nly when an accused expresses a clear and unambiguous assertion of his [or her] right to remain silent must investigators cease further questioning." *Id.* In *Akers v. Commonwealth, supra,* the Court favorably cited *State v. Nichols,* 212 Kan. 814, 512 P.2d 329, 332 (1973), as an example of appropriate clarity to end questioning. In that case, the defendant said words to the effect, "I do not want to answer any more questions." 216 Va. at 46, 216 S.E.2d at 31.

During the first three hours of the detective's questioning, defendant made several statements evidencing a growing reluctance to participate further in the interview. The detectives increased the intensity of their tactics, which did, in fact, heighten the defendant's awareness of her peril as it slowly wore down her resistance to divulging circumstances relating to Sanderlin's death. The Court, after carefully analyzing the interplay between the increasing pressure of police interrogation tactics and the defendant's corresponding hesitancy to continue the interview, concludes that her unqualified statement, "I want to stop talking about it," constituted an intentional and sufficiently clear demand to invoke her Fifth Amendment right to remain silent. Her words and the context of them revoked her previous waiver in a manner apparent to a reasonable person. In addition, they conformed to Smith's earlier explanation of how she could end questioning.

The Court fully understands yet rejects the Commonwealth's contention that defendant sought only to fend off a line questioning about what harm Sanderlin had done or attempted to do to her. The Court does not question that Jarvis, caught up as he was in the effort to solve an apparent homicide and believing as he did that defendant could do so, personally gave that interpretation to her words. However, the Court cannot accept such a narrow interpretation or construction of this factual record. In fact, Jarvis did not pause in any way upon the utterance of defendant's words and, although his questions arguably veered away from that topic for a short time, he soon pressed on with that line of questioning. Other statements made by defendant soon after her contested utterance, such as, "I really need to go to sleep tonight," "I'm just so

overwhelmed," and "Have you talked to my mom?" serve to confirm the Court's conclusion regarding the intent of her previous words. See Commonwealth's Exhibit 1, Interview Kelsey Helvenston, pp. 75–77.

Finding that defendant invoked her Fifth Amendment right to remain silent and that the detectives did not then cease questioning her, the court will thus suppress any statements made by her after that invocation.

## Conclusion

The Court concludes that the defendant understood her Miranda rights and voluntarily waived them. Her subsequent statements to the police were voluntary. However, the defendant was subjected to custodial interrogation under circumstances equating to *de facto* arrest, absent probable cause to do so. There existed a direct causal connection between the defendant's unlawful detention and the procuring of her incriminating statements. During the course of the custodial interrogation, the defendant invoked her Fifth Amendment right to remain silent and the police improperly failed to stop questioning her.

In reaching the above-noted conclusions, the Court does not intend to disparage the two detectives that conducted the defendant's questioning on March 22 and 23. The Court knows each of them to be dedicated and hardworking professionals who do not possess a reputation for acting contrary to citizens' constitutional rights. The Court simply concludes that, under the totality of facts and circumstances, the law requires that it grant the suppression motion.

The Court grants the Motion to Suppress and directs the Clerk of Court to draft an appropriate Order to effectuate this ruling. The Court notes the Commonwealth's exceptions to the Court's decision.