UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Causey, Raphael and Senior Judge Clements
Argued at Richmond, Virginia


MARCELO RAUL BELTRAN SAAVEDRA

MEMORANDUM OPINION[*] BY
v.        Record No. 1918-22-4        JUDGE STUART A. RAPHAEL
DECEMBER 28, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Brett A. Kassabian, Judge[1]

Taylor L. Dontje, Assistant Public Defender, for appellant.

Collin C. Crookenden, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Marcelo Raul Beltran Saavedra appeals his conviction under Code §§ 18.2-26 and

18.2-386.1(D) for attempting to use his smartphone to make a surreptitious recording of a

15-year-old girl as she used a toilet at the car dealership where he worked.  We reject Beltran's

claim that the trial court should have suppressed his incriminating statements to a detective.[2]

Although Beltran felt pressure to cooperate after the detective lawfully seized his smartphone

and threatened to execute a search warrant for Beltran's other phone at his residence, the totality

of the circumstances show that Beltran's statements were voluntary.  We also reject Beltran's

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Judge Kassabian presided at trial.  Judge John M. Tran denied the motion *in limine* to exclude evidence of prior bad acts.  Judge Robert J. Smith denied the motion to suppress Beltran's statements to police.

[2] While both parties on appeal refer to appellant as "Beltran Saavedra," the appellant told the detectives that his last name was "Beltran" and the parties called him "Mr. Beltran" at trial.

claim that the trial court should have excluded evidence of five other videos found on Beltran's smartphone showing women using toilets or showering. The videos were highly probative of Beltran's intent to film the victim. The videos also refuted Beltran's hypothesis of innocence that he sought only to "peek" at the victim, not record her. And we find ample evidence to support the trial court's finding of guilt beyond a reasonable doubt. So we affirm his conviction.

BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard" the defendant's evidence when it conflicts with the Commonwealth's evidence, "regard as true all the credible evidence favorable to the Commonwealth," and read "all fair inferences" in the Commonwealth's favor. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

On the afternoon of August 22, 2020, R.T. and K.T. took their 15-year-old daughter A.T. to a car dealership to buy her a car in anticipation of her getting a driver's license. Beltran, a salesperson, greeted the family and helped them buy the car. A.T. described Beltran as "very flirtatious"—he "complimented [her] outfit" several times and said she looked "very young." He also repeatedly offered for A.T. to "test driv[e]" one of the cars, but the family declined, telling him that she was only 15 years old.

While her parents spoke with Beltran, A.T. excused herself a few times to use the women's restroom upstairs. After the family chose the car they wanted, R.T. and K.T. went to the manager's office to sign the paperwork while A.T. went to use the women's restroom again. When she tried to go upstairs, however, Beltran told her that the restroom was "locked"; he directed her to a "unisex" bathroom in a waiting room downstairs.

- 2 -

Walking downstairs, A.T. noticed that the waiting room was empty and dark. She entered the small bathroom at the end of a hallway and locked the door behind her. Unlike the women's restroom, however, the unisex bathroom did not have any privacy stalls. A single toilet sat facing the bathroom door.

As A.T. pulled down her pants to use the toilet, she saw a blue smartphone appear under the door, its camera lens "angled" toward her. A.T. immediately stood up, pulled up her pants, and hid in the corner. The smartphone remained under the door for about ten seconds before withdrawing from view. About 30 seconds later, the smartphone camera reappeared, in the same position, and remained for another several seconds before again withdrawing from view. A.T. exited the bathroom and rejoined her parents. She texted her mother about what had just happened.

After completing the purchase, the family went to pick up the car. Beltran met them and presented the keys. Beltran asked A.T. and R.T. to pose for a photograph in front of the car. Beltran used his smartphone, a blue iPhone XR, to take their picture. A.T. recognized the smartphone as the one she had seen under the bathroom door. When A.T. and R.T. got in the car, A.T. discussed the incident with R.T., who reported it to police the next morning.

On August 24, 2020, Fairfax County Police Detectives Arvi Brito and Edwin Romero went to the dealership and obtained surveillance videos from the day of the incident. The videos showed Beltran follow A.T. to the unisex bathroom, crouch outside, and stick his smartphone underneath the door. After a few seconds, he walked away, gazing down at the screen. Moments later, Beltran returned to the bathroom door, crouched, and held his smartphone underneath the door again for another several seconds. Beltran then abruptly walked away, again looking down at the screen. A.T. then exited the bathroom and returned to her parents.

After watching those videos, Brito and Romero conducted an audio-recorded interview of Beltran inside an office at the dealership. The interview lasted about 82 minutes. Romero was in full uniform displaying his badge of authority; Brito was in "plain clothes" but wearing a police badge. Following Beltran into the office, Brito closed the door behind them for "privacy" but did not lock it. Brito identified himself and Romero as detectives and told Beltran that "[t]he door is right there. You don't have to talk with me, but I'd like to talk to you to clarify what happened."

After Beltran confirmed that he spoke English and was college-educated, Brito explained that he was investigating a report that someone had attempted to record a "young lady" who had used the restroom at the dealership. Brito said he had seen the surveillance videos of the incident and, "[u]nless we have a conversation and you tell me these things, all I have to go on is what I've seen." Brito told Beltran he did not have to speak with the detectives, but that if he refused, Brito would "move forward to the full extent of the law without getting [Beltran's] side of everything." Brito then asked, "Do you wish to talk to me about the case?"

When Beltran answered, "Not really," Brito took Beltran's smartphone and said that he was "seizing" it because it "contain[ed] evidence of crime." Brito said he would get a search warrant for the smartphone and "move forward based on that without [Beltran's] side of things." Brito suggested that it would be "beneficial" for Beltran to be "honest and forthcoming" about the incident. That way, Brito could tell a judge that Beltran had "confirmed everything" and had explained "why it happened." Brito reminded Beltran that he did not have to speak with him. Brito said, "I'm not going to make you talk to me."

Beltran said that his smartphone was "very important" to him and asked if he could show Brito its contents to prove there was "no evidence on it." Brito replied that he had to confiscate

the smartphone and that it could take "a few months" to analyze its contents, although Brito would try to return it "sooner" if Beltran "cooperat[ed]."

When Brito asked about other phones, Beltran said he had one at home, where he lived with his sick mother. Brito then told him there were at least "10 officers" outside Beltran's house, preparing to execute a search warrant. He asked Beltran to "imagine the stress that [would] cause" his mother. Brito said it would be unnecessary to search the residence, however, if Beltran agreed to discuss the incident. Beltran challenged Brito to "show [him] something that says you can take my stuff." Brito responded that he had probable cause to believe that the seized smartphone contained evidence that Beltran tried to "unlawful[ly] film[] a fifteen-year-old using the bathroom" and his other phone might contain similar evidence too, which justified a warrant to search the residence.

Beltran repeatedly requested to have his smartphone returned and declined to answer questions. Brito replied, "It sucks that I'll have to go to your house now and disturb your mother when it doesn't need to be done."

Beltran then asked, "What can we do so that you don't involve my mom?" Brito reiterated that if Beltran agreed to discuss the incident, then police would not have to search his residence. Brito said that he did not intend to "threat[en]" or "intimidat[e]" Beltran, but merely to explain to Beltran what Brito would "do next as part of the investigation."

About nineteen minutes into the interview, Beltran asked Detective Brito, "How can I help you help me?" Brito replied, "we can be honest with each other" and Beltran could tell them "what happened." Beltran replied, "I kinda tried something but I don't have any footage . . . I'm just worried about my mom." Brito reminded Beltran, "Like I told you from the beginning, you don't have to talk to me. I would like to talk to you [but] the door's right there."

- 5 -

Beltran then admitted that he had followed A.T. to the unisex bathroom and used his smartphone's camera to "look underneath" the door while she was inside. He denied attempting to "record" her; he said he just wanted to "peek" underneath the door. Beltran denied any sexual interest in minors. He said he thought A.T. was 19 years old.

Beltran admitted to Brito that he had "secretly" recorded "girlfriends" at his residence and saved the videos on his smartphone. Beltran later denied recording his girlfriends without their knowledge, although he admitted that he might have done that when he "was younger." He said he never recorded his girlfriends "in public, especially [not] at work."

Detectives Brito and Romero obtained a warrant to search Beltran's smartphone, which contained five videos of different women using the toilet or showering. A 47-second video from January 2020 depicts a woman enter Beltran's bedroom bathroom, drop her pants, and use the toilet. A four-minute video from February 2020 shows another woman enter the same bathroom, lower her pants, and use the toilet. A 55-second video from June 2020 shows another woman using the toilet in the same bathroom. Finally, two videos dated June 25, 2019, depict a nude woman showering and getting dressed in a different bathroom. None of the women show any awareness of being filmed or of the camera's presence. Romero determined that each video was likely recorded using a "stationary" camera, not a smartphone.

Brito and Romero searched Beltran's residence and found a hidden camera on a dresser in his bedroom. The camera resembled a cologne bottle and had a slot for a "memory card." Data found on Beltran's smartphone showed that he had purchased that camera.

A grand jury indicted Beltran under Code §§ 18.2-26 and -386.1 for attempting to knowingly and intentionally create a videographic or still image of a nonconsenting minor in a state of undress. Before trial, Beltran moved to suppress his statements to Detective Brito, arguing that his will was "overborne" by "the temptation to . . . get his phone back as quickly as

possible" and by his "emotional" concerns for his mother's well-being. The trial court denied the suppression motion.

The trial court also denied Beltran's motion *in limine* to exclude the videos of other women as inadmissible evidence of "prior bad acts." The court found the videos probative of Beltran's intent to record the victim and concluded that the probative value outweighed any incidental prejudice.

At the bench trial that followed, the trial court denied Beltran's motion to strike the evidence and found him guilty of an attempted violation of Code § 18.2-386.1. The court sentenced Beltran to five years' incarceration, suspending all but one year and nine months. Beltran noted a timely appeal.

ANALYSIS

*A.  Voluntariness of Interview Statements (Assignment of Error 2)*

Beltran contends that his interview statements were coerced and should have been suppressed.[3] An appellant "challenging the trial court's denial of his motion to suppress . . . 'bears the burden of establishing that reversible error occurred.'" *Saal v. Commonwealth*, 72 Va. App. 413, 421 (2020) (quoting *Mason v. Commonwealth*, 291 Va. 362, 367 (2016)). Under the Due Process Clauses of the Fifth and Fourteenth Amendments, a criminal defendant's statements to police must be voluntary to be admissible against him at trial. *Bottenfield v. Commonwealth*, 25 Va. App. 316, 323 (1997). The Commonwealth bears the burden at a suppression hearing "to prove, by a preponderance of the evidence, that a defendant's confession was freely and voluntarily given." *Id.* On appeal, "we defer to the [trial] court's findings of

_____

[3] Beltran does not challenge the search of his residence or the seizure and search of his smartphone.

- 7 -

historical fact unless plainly wrong or without evidentiary support," but we "review the legal question of voluntariness *de novo*." *Keepers v. Commonwealth*, 72 Va. App. 17, 40 (2020).

When evaluating the voluntariness of a confession,

> [w]e must [independently] determine whether, in light of the totality of the circumstances, including not only the details of the interrogation, but also the characteristics of the accused, the statement was the product of an essentially free and unconstrained choice by its maker, or whether the maker's will was overcome and his capacity for self-determination critically impaired.

*Id.* at 40-41 (alterations in original) (quoting *Novak v. Commonwealth*, 20 Va. App. 373, 386-87 (1995)). "[T]he defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview" are relevant to determining whether a defendant's confession was voluntary. *Id.* at 41 (quoting *Washington v. Commonwealth*, 43 Va. App. 291, 302 (2004)). "[W]e 'must consider the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation.'" *Id.* (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)).

"What renders a confession involuntary is not any threat or promise, but rather a threat or promise of illegitimate action." *Hill v. Commonwealth*, 52 Va. App. 313, 322 (2008) (quoting *United States v. Contreras-Del Toro*, 892 F. Supp. 159, 160 (S.D. Tex. 1995)). Thus, "[v]oluntariness is not equated with the absolute absence of intimidation." *Robinson v. Commonwealth*, 63 Va. App. 302, 312 (2014) (alteration in original) (quoting *Hill*, 52 Va. App. at 319). For instance, we have found a defendant's confession to be voluntary despite that detectives told the defendant that "her cooperation would 'go a long way' with their superiors and the prosecutor." *Keepers*, 72 Va. App. at 42. Although the defendant in *Keepers* experienced "'tremendous' psychological pressure," *id.* at 41, to confess, she was an "intelligent," *id.* at 37, college student who "willingly accompanied law enforcement officers to a

police station," where detectives interviewed her "in a room with a closed but unlocked door" in a relaxed environment, *id.* at 35-36.

Similarly, a defendant's "desire to extricate [a family member] from a valid arrest does not in itself render [a] confession involuntary." *Hill*, 52 Va. App. at 321. In *Hill*, police lawfully arrested the defendant and his sister for cocaine possession. 52 Va. App. at 319. Hill argued that his confession was involuntary because it was induced by an officer's threats to prosecute his sister if he did not confess. *Id.* at 319-20. We held that the officer's promise to forgo a valid prosecution against a lawfully charged party was not unconstitutionally coercive. *Id.* A "confession is not *per se* invalid merely because the confessor implicates himself in an effort to secure the best possible disposition of a charge pending against a relative or friend." *Id.* (quoting *Ferguson v. Boyd*, 566 F.2d 873, 878 n.7 (4th Cir. 1977) (per curiam)). The officer's "intimation that [the defendant]'s sister may be prosecuted" merely informed Hill "of the possible consequences of his" actions; it was based in fact and was not an act of retribution. *Id.* at 322-23. Although the "circumstances may have presented [Hill] a difficult choice," they did not induce him to confess to exculpate his sister. *Id.* at 323.

A defendant's confession may be found voluntary under the totality of circumstances even when police use deception to procure it. We have found confessions voluntary despite that police misstated to a minor defendant with learning disabilities, crying for his mother, that he would be tried as an adult, *Robinson*, 63 Va. App. at 308, 314-15; lied to a defendant that his fingerprints had been found on the victim's clothes, *Novak*, 20 Va. App. at 380; lied that the victim had identified the defendant in a lineup, *Wilson v. Commonwealth*, 13 Va. App. 549, 553-55 (1992); and used "fabricated fingerprint and DNA reports" to make the defendant think he had been caught, *Arthur v. Commonwealth*, 24 Va. App. 102, 108 (1997). That is not to say that such police deception is praiseworthy. A "deliberate falsehood by a police officer in the

- 9 -

course of his duties may undermine the respect that significant segments of the public may have for law enforcement and the system of justice." *Novak*, 20 Va. App. at 387 (quoting *Wilson*, 13 Va. App. at 554). But "a lie on the part of an interrogating police officer does not, in and of itself, require a finding that a resulting confession was involuntary." *Id*. at 388 (quoting *Wilson*, 13 Va. App. at 555).

Measured against those cases and viewing the totality of circumstances, we find unpersuasive Beltran's claim that his will was overborne by Detective Brito. Only threats or promises of "illegitimate action" may render a confession involuntary. *Hill*, 52 Va. App. at 322. Beltran does not claim that his smartphone was unlawfully seized. Nor does he claim that Brito lacked probable cause to obtain a warrant to search his residence. Those facts distinguish this case from *Ferguson*, the principal case that Beltran relies on, where the defendant was illegally interrogated after invoking his right to remain silent, unlawfully detained for six days, and coerced into confessing by a threat to prosecute his girlfriend, who had also been illegally detained. 566 F.2d at 877-79. True, Brito falsely told Beltran that ten officers were about to execute a search warrant at Beltran's residence, where Beltran's ailing mother was staying. But executing that search warrant would have been permissible. And in any event, Brito's conduct was not nearly as coercive as the conduct that we found insufficiently coercive in *Robinson*, *Novak*, *Wilson*, and *Arthur*.

Other circumstances too militate against a finding of undue coercion. Detectives Brito and Romero interviewed Beltran in an unlocked office at the dealership for about 82 minutes. Beltran was not arrested or detained, and Brito maintained an "approachable, non-confrontational" demeanor throughout. *Cf. Keepers*, 72 Va. App. at 35-42 (finding confession voluntary despite police pressure to "cooperate" where the defendant was college-educated and interviewed in an unlocked room in a relaxed environment). Brito and

- 10 -

Romero identified themselves at the start as detectives, confirmed that Beltran spoke English and was college-educated, and described the nature of their investigation. Before Beltran incriminated himself, Brito repeatedly reminded him that he was free to leave and did not have to discuss the incident. *See, e.g.*, *Kauffmann v. Commonwealth*, 8 Va. App. 400, 404-06 (1989) (finding that the defendant voluntarily confessed despite experiencing "severe psychological strain" due to his daughter's recent death, given that the police made clear the defendant was "free to leave" and "did not have to answer any questions").

Thus, we find on de novo review that Beltran's will was not overborne and that his interview statements were voluntary.

*B. Admissibility of Smartphone Videos (Assignment of Error 1)*

Beltran argues that the videos obtained from his smartphone were inadmissible evidence of prior bad acts. He says that "there was no causal relationship or logical connection between the videos and the allegation with A.T." Alternatively, he contends that any probative value of the videos was outweighed by the prejudice to his defense. We disagree.

A trial court exercises discretion when determining whether to admit evidence, and we will not overturn its decision absent an abuse of discretion. *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020). A trial court "by definition abuses its discretion when it makes an error of law." *Dean v. Commonwealth*, 61 Va. App. 209, 213 (2012). We thus review de novo "evidentiary issues presenting a 'question of law.'" *Abney v. Commonwealth*, 51 Va. App. 337, 345 (2008) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)). But when admissibility "requires the resolution of an underlying factual issue, the trial court must determine those facts by a preponderance of the evidence." *Harvey v. Commonwealth*, 76 Va. App. 436, 475 (2023). "Such subsidiary findings are binding on appeal 'unless "plainly

- 11 -

wrong" or without evidence to support them.'" *Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019) (quoting *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017)).

"Evidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue." *Kenner v. Commonwealth*, 299 Va. 414, 425 (2021) (quoting *Clay v. Commonwealth*, 262 Va. 253, 257 (2001)); *see also* Va. R. Evid. 2:401 (defining relevant evidence). Generally, however, "evidence which shows or tends to show that the accused is guilty of other crimes and offenses at other times, even though they are of the same nature as the one charged in the indictment, is not admissible to show the accused's commission of the particular crime charged." *Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008); Va. R. Evid. 2:404(b). Still, Rule 2:404(b) "explicitly allows" such evidence "if its probative value outweighs its incidental prejudice" and "if it tends to prove any relevant fact pertaining to the offense charged." *Brooks v. Commonwealth*, 73 Va. App. 133, 147 (2021) (quoting Va. R. Evid. 2:404(b)). Relevant facts may include "motive, opportunity, *intent*, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan." *Id.* (emphasis added) (quoting Va. R. Evid. 2:404(b)).

"[O]ther crimes evidence is, by its nature, highly prejudicial to an accused." *Wilson v. Commonwealth*, 16 Va. App. 213, 220 (1993). "*[I]n a jury trial*, 'the introduction of inadmissible evidence of another crime . . . "confuses one offense with the other," and "by showing that the accused has a criminal propensity, tends to reverse [the] presumption of innocence."'" *Purvis v. Commonwealth*, 31 Va. App. 298, 308 (2000) (second alteration in original) (emphasis added) (quoting *Godwin v. Commonwealth*, 6 Va. App. 118, 123 (1988)). By contrast, "[a] trial court is presumed to apply the law correctly." *Shenk v. Shenk*, 39 Va. App. 161, 169 (2002). "[J]udges, unlike jurors, are presumed capable of distinguishing inadmissible evidence from admissible evidence." *Breeden v. Commonwealth*, 43 Va. App. 169, 188 (2004).

"Trial judges are also presumed to have considered the presented evidence 'only in its permissible context.'" *Id.* (quoting *Vanhook v. Commonwealth*, 40 Va. App. 130, 135 (2003)). Thus, absent "clear evidence to the contrary," we presume "that a trial judge [has properly] disregard[ed] prejudicial or inadmissible evidence." *Id.* (alterations in original) (quoting *Cole v. Commonwealth*, 16 Va. App. 113, 116 (1993)).

Here, the videos found on Beltran's smartphone were highly probative of his specific intent to record A.T.—the sole element in dispute at trial. Those videos showed his "sexualized interest" in surreptitiously recording women using the restroom, generally, and his intent to record A.T., specifically. *See Kenner*, 299 Va. at 426 (finding titles of videos depicting child pornography probative of the defendant's "sexualized attitude toward children in general" and his "lascivious intent" to sexually abuse the child victim). The videos were especially relevant to refute Beltran's claim that he was trying only to "peek" at A.T., not make a videorecording of her using the toilet.

Although the videos of other women were not recorded using a smartphone and did not depict children using the toilet in a public restroom, the trial court found that they each depicted women either using the toilet or showering in bathrooms "under circumstances that" were "clear[ly] . . . inconsistent with consent." Considering Beltran's admission that he had "secretly" recorded women he claimed were his girlfriends and saved the videos on his smartphone, the trial court's finding is not "plainly wrong" and is therefore binding on appeal. *Harvey*, 76 Va. App. at 475. The videos showed that Beltran recorded women in a state of undress in a manner that "mirrored or w[as] closely akin to" the way he tried to record A.T. using the toilet at the car dealership. *Kenner*, 299 Va. at 427. The videos were thus highly probative of Beltran's specific intent to surreptitiously record A.T. in a state of undress.

We also find no abuse of discretion in the trial court's judgment that the legitimate probative value of the videos outweighed its incidental prejudice to Beltran. Any incidental prejudice to Beltran was mitigated by the fact that the evidence was introduced at a bench trial. *See Breeden*, 43 Va. App. at 188 (noting that, absent clear evidence to the contrary, "[t]rial judges are . . . presumed to have considered the presented evidence 'only in its permissible context'" (quoting *Vanhook*, 40 Va. App. at 135)). And Beltran does not point to anything in the record to suggest that the trial court considered the video evidence for an inadmissible purpose.

### C. Sufficiency (Assignment of Error 3)

Beltran argues that the prosecution failed to prove his specific intent to record A.T. Emphasizing his own statements to police denying any intention to record A.T., Beltran argues that the Commonwealth failed to exclude the reasonable hypothesis of innocence that he intended only to "peek" at A.T., not record her.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The relevant issue on appeal is, 'upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Lambert v. Commonwealth*, 298 Va. 510, 515 (2020) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)).

"Intent is the purpose formed in a person's mind at the time an act is committed." *Johnson v. Commonwealth*, 53 Va. App. 79, 100 (2008) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 519 (1998)). "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts [that] are within the province of the

trier of fact." *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)).

The record here amply supports the trial court's finding that Beltran intended to record A.T. while she used the toilet at the dealership. Beltran steered A.T. to the unisex bathroom by telling her that the women's restroom she had used several times already was now "locked." The toilet in the bathroom faced the door and had no privacy walls. Beltran then followed A.T. to the bathroom and crouched by the door, sticking his smartphone underneath and angling the camera toward her. His claim that he tried only to "peek" was contradicted by the surveillance video, which showed that Beltran did not look at his smartphone's screen while pointing the camera. After a few seconds, Beltran stood and looked at the smartphone's screen. Apparently dissatisfied with what he saw, he returned to crouch by the bathroom door one more time, sticking the smartphone underneath again for a few seconds.

As already discussed, Beltran's claim that he did not intend to record A.T., only "peek" at her, was contradicted by his recordings of other women in bathrooms, naked during and after showering, or pulling their pants and underwear down to use the toilet. And in any case, the trial court acted within its discretion to treat Beltran's denial as "little more than lying to 'conceal his guilt,' and could treat such prevarications as 'affirmative evidence of guilt.'" *Coleman v. Commonwealth*, 52 Va. App. 19, 25 (2008) (first quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 10 (2004); and then quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

CONCLUSION

The trial court did not err in denying Beltran's suppression motion, refusing to exclude the videos of other women in a state of undress, or denying his motion to strike the evidence.

*Affirmed.*